## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SELECT SPECIALTY HOSPITAL-<br>HOUSTON HEIGHTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:05CV01791 (RBW) |
| | ) | |
| MICHAEL O. LEAVITT[1], | ) | |
| Secretary of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT
## AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Michael O. Leavitt, Secretary of Health and Human Services ("Defendant" or "the Secretary"), respectfully moves this Court for summary judgment in the Secretary's favor because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.

In support of this motion, Defendant respectfully submits the attached memorandum, statement of material facts not in genuine dispute, response to plaintiffs' statement of facts, and a proposed order. The Certified Administrative Record has previously been filed with the Court.

Respectfully submitted,

_____/ s /_____
JEFFREY A. TAYLOR,
United States Attorney
D.C. Bar No. 498610

---

[1]  Michael O. Leavitt is substituted as Defendant pursuant to Fed. R. Civ. Pro. 25(d)(1).

_____/ s /_____
MEGAN L. ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7220/FAX: (202) 514-8780


_____/ s /_____
JONATHAN C. BRUMER
D.C. Bar No. 463328
U.S. Department of Health and Human
  Services
Office of the General Counsel
Centers for Medicare and Medicaid Services
  Division
330 Independence Ave., S.W.
Cohen Building, Room 5344
Washington, D.C. 20201
(202) 205-8703/FAX: (202) 401-1405

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SELECT SPECIALTY HOSPITAL-<br>HOUSTON HEIGHTS, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 1:05CV01791 (RBW) |
| MICHAEL O. LEAVITT[1], <br>Secretary of Health and Human Services, | ) ) ) | |
| Defendant. | ) ) ) | |

---

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendant Michael O. Leavitt, Secretary of Health and Human Services ("Defendant" or "the Secretary"), respectfully moves this Court for summary judgment under Rule 56. For the reasons set forth below, there are no genuine issues in dispute and Defendant is entitled to judgment as a matter of law.

### INTRODUCTION

Plaintiff Select Specialty Hospital-Houston Heights ("Select Specialty"), a long term care hospital which participates in the Medicare program, brought this action against Defendant Michael O. Leavitt, Secretary of Health and Human Services ("Defendant" or "the Secretary"), seeking judicial review of a final administrative decision of the Secretary. In that final agency decision, the Secretary reversed an earlier decision by a lower administrative tribunal, the Provider Reimbursement Review Board ("PRRB" or "Board"), in which the PRRB had held that

---

[1] Michael O. Leavitt is substituted as Defendant pursuant to Fed. R. Civ. Pro. 25(d)(1).

Select Specialty was entitled to a so-called "continuous improvement" bonus ("CIB") for its

Medicare cost reporting period ending August 31, 1999.  The Secretary reversed the PRRB for

two reasons.  First, the Secretary reasoned that because Select Specialty filed its Medicare cost

report without claiming entitlement to a CIB, the hospital could not meet the statutory

requirement of being "dissatisfied" with the determination of the amount of reimbursement it

was due for the year in question, which is a precondition to PRRB jurisdiction.  Second, the

Secretary concluded that, even if the PRRB had jurisdiction to hear Select Specialty's case,

Select Specialty did not qualify for a CIB because it did not operate as a long term care hospital

for "at least 3 full cost reporting periods" prior to the cost period for which it sought a CIB, as the

statute and regulations require.  Plaintiff contends that the Secretary's final decision is unlawful,

unreasonable, and not supported by substantial evidence in the record, and therefore unlawful.

However, because the Secretary's decision was based on a reasonable interpretation and

application of the statutory and regulatory language governing the PRRB's jurisdiction and

eligibility for a CIB, and was entirely lawful, the Court should grant summary judgment for

Defendant.

**STATUTORY AND REGULATORY BACKGROUND**

I.    **The Medicare Program Generally**

The Medicare program, established under title XVIII of the Social Security Act, 42

U.S.C. §§ 1395-1395ggg ("the Medicare statute"), pays for covered medical care furnished

primarily to eligible aged and disabled persons.  Medicare consists of two main parts, Part A and

Part B.  Under Part A of the program, payment is provided for certain inpatient hospital and post-

hospital extended care services.  42 U.S.C. §§ 1395c, 1395d, 1395i, 1395x(b), 1395x(i).  Part B

covers primarily physicians' services, outpatient hospital care and some other medical services that Part A does not cover.  See 42 U.S.C. §§ 1395j, 1395k, 1395x(q).

The Secretary has delegated the responsibility of administering the Medicare program to the Centers for Medicare and Medicaid Services ("CMS").  A hospital participates in Medicare under a "provider agreement" with the Secretary.  See 42 U.S.C. § 1395cc.  Medicare payments to hospitals and other providers ordinarily are made through private organizations (typically insurance companies) which act as "fiscal intermediaries," or paying agents, under contracts with the Secretary.  See 42 U.S.C. § 1395h.

In 1965, at the start of the Medicare program, hospitals received reimbursement for the "reasonable cost" of providing inpatient services, subject to certain limits.  42 U.S.C. §§ 1395f(b)(1), 1395x(u), 1395x(v).  As part of the Social Security Amendments of 1983, Pub.L. No. 98-21, 97 Stat. 65, Congress established the prospective payment system ("PPS") for the operating costs of acute care hospital inpatient stays, which took effect with cost reporting periods beginning on or after October 1, 1983.  See 42 U.S.C. § 1395ww(d).  Under PPS, hospitals receive a fixed, prospectively determined, per discharge payment amount based on the diagnosis-related group ("DRG") in which an individual patient is classified.  PPS applies to "subsection (d) hospital [s]."  See 42 U.S.C. § 1395ww(d)(1)(A).

## II.    Long Term Care Hospitals

Congress has excluded several types of hospitals from the definition of a "subsection [1395ww] (d) hospital" and thus from PPS, including "hospital[s] which ha[ve] an average inpatient length of stay (as determined by the Secretary) of greater than 25 days."  See 42 U.S.C. § 1395ww(d)(1)(B)(iv)(I).  Consistent with the statute, the Secretary has promulgated regulations

- 3 -

which exclude, among other types of hospitals, those that have both entered into a provider

agreement to participate as a hospital and have "an average Medicare inpatient length of stay of

greater than 25 days."  See 42 C.F.R. §§ 412.22, 412.23(e).  Hospitals that meet these two

regulatory requirements are known as Long Term Care Hospitals ("LTCHs").  During the period

relevant to this action, hospitals which were excluded from PPS, like LTCHs, received

reimbursement under the "reasonable cost" payment system, subject to certain limits.  See 42

U.S.C. § 1395f(b)(1), 1395x(v)(1)(A); 42 C.F.R. § 412.22(b).

III.    **The Continuous Improvement Bonus**

    In the Balanced Budget Act of 1997 ("BBA"), Congress established the Continuous

Improvement Bonus ("CIB"), with the goal of rewarding those providers that were able to

demonstrate that they had kept their Medicare costs-per-discharge under certain specified limits

by providing those qualifying providers with a bonus or incentive payment.  See Pub. L. No. 105-

33, 111 Stat 251, 406 (Aug. 5, 1997) codified at 42 U.S.C. §§ 1395ww(b)(1), 1395ww(b)(2).

    However, Congress instructed that a CIB would only be paid to an "eligible hospital,"

which it defined as one that has met two conditions.  See 42 U.S.C. § 1395ww(b)(2)(B).  First,

Congress required that the hospital seeking a CIB demonstrate that its "operating costs for the

period are less than the least of" certain benchmarks: "its target amount, its trended costs . . . , or

its expected costs . . . for the period," and defined these terms elsewhere in the statute.  See 42

U.S.C. §§ 1395ww(b)(2)(B)(ii).  Second, Congress required that a hospital seeking a CIB

demonstrate that it "has received payments under this subsection [i.e., as a PPS-exempt hospital]

for at least 3 full cost reports before that cost reporting period [for which it seeks a CIB.]"  See

42 U.S.C. § 1395ww(b)(2)(B)(i) (emphasis added).

- 4 -

The Secretary has promulgated implementing regulations which enumerate the standards

for CIB eligibility, using language which hews closely to the statutory language.  <u>See</u> 42 C.F.R.

§ 413.40(d)(5).  Specifically, the Secretary's regulations identify the following "[e]ligibility

requirements for continuous improvement bonus payments":

> To qualify [for continuous improvement bonus payments], a hospital must have
> been paid as a prospective payment excluded hospital for at least three <u>full</u> cost
> reporting periods prior to the applicable period, and the hospital's operating cost
> per discharge for the period must be less than the least of the following:
>> (i) The hospital's target amount
>> (ii) The hospital's trended costs.

<u>See</u> 42 C.F.R. § 413.40(d)(5) (emphasis added).  The Secretary has defined the terms "target

amount," "trended costs," and "expected costs" in his regulations using language which is

consistent with the statutory language.  <u>See</u> 42 C.F.R. §§ 413.40(a)(3), 413.40(b)(1),

413.40(d)(5)(A), 413.40(d)(5)(B), 413.40(d)(5)(iii).  Consistent with the statute, the Secretary

has defined these terms using formulas which make refer throughout to "12 month" cost

reporting periods and to "fiscal year[s]."  <u>Id</u>.

## IV.    <u>The Important Role of Cost Reports in the Medicare Reimbursement Process.</u>

Medicare reimbursement is typically made to providers by "fiscal intermediaries," such as

insurance companies, that contract with the Secretary.  <u>See</u> 42 U.S.C. §§ 1395h(a), 1395kk-1.

Intermediaries make pre-audit payments, known as interim payments, to providers at least

monthly.  <u>See</u> 42 U.S.C. § 1395g(e); 42 C.F.R. § 413.60.  The interim payment amount is an

estimate derived from projections of the services the provider is likely to render in the current

fiscal year.  Where providers are paid on a "reasonable cost" basis, as in the case of LTCHs, the

projections are based on the historical level of service for the provider, with appropriate

adjustments.  See 42 C.F.R. § 413.64(e).  The intermediary engages in a reconciliation process at the end of a provider's fiscal year to determine whether the provider was overpaid or underpaid as a result of its estimated interim payments.

Every provider submits a cost report annually to its intermediary that details the costs incurred for services furnished Medicare beneficiaries for which the provider claims reimbursement. 42 C.F.R. §§ 413.20, 413.24(f).  These cost reports provide an essential function as they inform Fiscal Intermediaries and CMS about which ones of the literally thousands of cost items which are potentially subject to Medicare reimbursement are being claimed by a given provider.  In general, the provider must submit a complete cost report to the fiscal intermediary within five months of the end of the provider's cost reporting period.  See 42 C.F.R. § 413.24(f)(2)(i).  The period covered by the cost report is generally the consecutive "12-month period the provider's fiscal year.  See 42 C.F.R. § 413.24(f).

The fiscal intermediary reviews the provider's cost report, audits items in the report if necessary, and then issues a written Notice of Program Reimbursement ("NPR"), which represents the intermediary's final determination as to the total payment owed to the provider for the year.  See 42 C.F.R. § 405.1803; see also 42 C.F.R. § 405.1801(a) (defining "intermediary determination" as "a determination of the amount of total reimbursement due the provider * * * for the period covered by the cost report").  The NPR reflects the intermediary's comparison of the overall reimbursement for the reporting period with estimated payments already made to the provider.  Any deficiency is paid by the Secretary, and any overpayment is repaid by the provider.  42 C.F.R. §§ 405.1803(c), 413.60(c).

V.    **The Administrative Appeals Process and Judicial Review of "Final" Decisions**

The Medicare statute and regulations establish an administrative process under which hospitals and other healthcare providers must establish their right to payment under the Medicare program.  The provider may appeal the NPR to the PRRB.  The statute and implementing regulations however impose several important preconditions to PRRB jurisdiction.  For one thing, a provider seeking PRRB review must establish that it "is dissatisfied with a final determination of the . . . fiscal intermediary . . . as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made  . . . for the period covered by [the cost] report."  See 42 U.S.C. § 1395oo(a)(1)(A)(i) (emphasis added); see also 42 C.F.R. § 1841(a)(1) (further instructing that a "request for Board hearing must identify the aspects of the determination with which the provider is dissatisfied, and explain why the provider believes the determination is incorrect in such particulars . . . ").  In addition, at least $10,000 must be at issue in an individual appeal, and the provider must request the hearing within 180 days of issuance of the NPR.  See 42 U.S.C. § 1395oo(a)(2), (3);  see also 42 C.F.R. §§ 405.1835, 405.1839, 405.1841(a).

The PRRB "decides questions relating to its jurisdiction to grant a hearing, including," but not limited to, questions regarding whether the "timeliness" and "amount in controversy" requirements have been met.  See 42 C.F.R. § 405.1873(a).  In addition, the statute provides that "[t]he Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such

matters were not considered by the intermediary in making such final determination."  See 42 U.S.C. § 1395oo(d).

If the Board has jurisdiction and the authority to decide the issues, see 42 C.F.R. § 405.1867, it holds a hearing and issues a decision that is reviewable by the Secretary's delegate, the Administrator of the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration).  See 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875.  Specifically, the Administrator, "on his or her motion, in response to a request form a party to a Board hearing or in response to a request from CMS" may, "at his or her discretion, . . . review any final decision of the Board, including a decision under [42 C.F.R. § ] 405.1873 about the Board's jurisdiction to grant a hearing."  See 42 C.F.R.§ 405.1875(a).

A provider has sixty days to request judicial review of the "final" decision of the Secretary.  See 42 U.S.C. § 1395oo(f)(1) (referring to the "right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary," as the case may be, by "a civil action commenced within 60 days" of the final decision); see also 42 C.F.R. § 405.1877.  Where the Administrator decides to review a PRRB decision, the Administrator's decision (not the earlier PRRB decision) is the judicially reviewable "final" decision of the Secretary.  See 42 U.S.C. § 1395oo(f)(1) (instructing that "[a] decision by the Board shall be final unless the Secretary . . . . reverses, affirms or modifies the Board's decision" and that judicial review may be sought of the "final decision"); 42 C.F.R. § 405.1877 (reiterating that "[t]he Board's decision is not final if the Administrator reverses, affirms, or modifies the decision" and that judicial review may be sought of the "final decision of the Board" or subsequent decision of the Administrator, which ever is the "final decision").

- 8 -

## STATEMENT OF FACTS AND PRIOR PROCEEDINGS

Select Specialty is a Medicare certified LTCH, located in Houston, Texas.  See Certified

Administrative Record for Select Specialty Hosp.-Houston Heights v. Thompson, 1:05CV01791

(RBW) (D.D.C. filed Sept. 9, 2005) ("AR") at 2, 106, 165, 301.  Select Specialty opened on

September 1, 1994, and was certified by Medicare on March 1, 1995.  See AR 2, 139 (transcript

page 66), 168; but see AR 301 (cost report, indicating that it was certified on "9/1/1994").

During the period relevant to this action, Select Specialty was a provider of services under the

federal Medicare program.  See AR 2, 32, 106, 164.  During the period relevant to this appeal,

Select Specialty's fiscal intermediary was Mutual of Omaha.  See AR 162, 164-65, 175, 195.

**A.     Select Specialty Fails to File Three Full 12 Month Cost Reports Prior to its Cost Report for the FYE August 31, 1999.**

Select Specialty submitted its first cost report as a LTCH to its fiscal intermediary, for the

12 month period from March 1, 1995 through February 29, 1996.  See AR 2, 168, 199, 281.

Select Specialty submitted its second cost report as a LTCH for the 12 month period from March

1, 1996 through February 28, 1997.  AR 2, 168, 199, 281.

Select Specialty submitted a third cost report which only covered a 6 month period, from

March 1, 1997 through August 31, 1997.  See AR 2, 168, 199, 281.  This filing of a cost report

for only a 6 month period was apparently the result of a change in the hospital's fiscal year end.

See AR 2, 281.  Select Specialty submitted a fourth cost report which only covered an 11 month

period, from September 1, 1997 through July 31, 1998.  See AR 2-3, 168, 281.  A change in the

hospital's ownership is apparently what prompted Select Specialty to filing a cost report for only

an 11 month period.  AR 2-3, 281.  Select Specialty submitted a fifth cost report for a 13 month

period, from August 1, 1998 through August 31, 1999.  See AR 3, 168, 281.

**B.    Select Specialty Fails to Claim In any Way a CIB in Its Cost Reports.**

Select Specialty filed its fifth cost report, for the cost reporting period ending August 31, 1999, without in any way claiming a Continuous Improvement Bonus.  See AR 3, 6, 26, 33, 106, 125, 130-32, 151-52, 158.  Specifically, Select Specialty did not complete or "populate" either one of the two lines in its cost report which relate to the CIB, lines 58.01 (the trended cost line) or line 58.02 (the expected cost line) of Worksheet D-1, Part II of CMS form 2552-96.  See AR 3, 6, 33, 158, 290 (Select Specialty's Supplemental Submission, acknowledging that "Houston Heights did not, however, file its cost report [for the cost reporting period ending August 31, 1999] with either the trended costs or expected costs populated").  Data contained in line 58.01 and 58.02 are used by Intermediaries to determine whether a hospital is eligible for a CIB.  See AR 3, 6, 33, 192-93, 200, 238.  Even if a hospital is eligible for a CIB, unless it inputs data in both lines 58.01 and 58.02, the Intermediary has no way of computing a CIB bonus (on line 58.03 of that same cost report), or indeed of knowing that the hospital intends to claim a CIB. See AR 3, 6, 33, 192-93, 200, 238; 42 U.S.C. §§ 1395ww(b)(2)(A), 1395ww(b)(2)(E) (indicating that the CIB which is to be awarded to an eligible LTCH is a function of the target amount and the expected costs).  Select Specialty did not itself complete or "populate" line 58.03.  See AR 3, 6, 127, 158.  Nor did Select Specialty in any way claim a CIB in connection with any of its earlier cost reports.  See, e.g., AR 347 (cost report for period ending August 31, 1997, listing "[$]0" in lines 58.01, 58.02, and 58.03), 397 (cost report for period ending August 31, 1998, listing "[$]0" in lines 58.01, 58.02, and 58.03).

**C.    The Intermediary's Adjustments to Plaintiff's Cost Report for the Cost Reporting Period Ending August 31, 1999**.

The Intermediary reviewed Select Specialty's cost report for the cost reporting period ending August 31, 1999.  See AR 3, 106, 165, 618-19.  On February 28, 2002, the Intermediary issued an NPR for the cost reporting period ending August 31, 1999.  See AR 3, 164, 180, 618-27.  The Intermediary did not award Select Specialty a CIB in that NPR.  Id.  Although the Intermediary made an adjustment in its NPR to line 58.02 (the expected cost line), it did not complete line 58.01 (the trended cost line) or line 58.03 (the calculation of a CIB bonus).  See AR 3, 180, 616, 618-20, 626.

**D.    The Plaintiffs' Administrative and Judicial Appeals**.

Although it had not claimed a CIB anywhere in its cost reports, Select Specialty subsequently apparently became convinced that it was entitled to one.  On August 22, 2002, nearly six months after the filing of its cost report, Select Specialty requested a hearing before the PRRB concerning two issues, one of which concerned the fact that the Intermediary had not awarded it a CIB for its fiscal year ended August 31, 1999.  See AR 614-16.[2]  Specifically, in relevant part, Select Specialty complained that the Intermediary had "adjusted the expected costs on Worksheet D-1, line 58.02," but "did not populate the trended costs on Worksheet D-1, line 58.01," and "respectfully request[ed]" that the PRRB "populate Worksheet D-1, line 58.01 so that the CIB calculation can be completed."  See AR 615-16.

---

[2]    The other issue concerned an intermediary disallowance based on the so-called Provider Statistical and Reimbursement System.  See AR 615.  This issue was subsequently resolved by the parties during the PRRB proceedings, see AR 166, 279, 601, and is not relevant to this action.

On May 10, 2005, the PRRB issued a decision in which it found that it had jurisdiction over the CIB issue and that Select Specialty qualified for a CIB.  See AR 28-37.  One PRRB member dissented from the PRRB's holding on jurisdiction.  See AR 37.  On May 20, 2005, the Intermediary requested that the Administrator review both the jurisdictional and merits portions of the PRRB decision.  See AR 26-27.  On June 22, 2005, Select Specialty filed comments in support of an affirmance of the PRRB's decision.  See AR 13-23.  On June 23, 2005, CMS filed comments in which they urged the Administrator to reverse the PRRB's conclusions regarding jurisdiction and the merits.  See AR 10-12.  On July 11, 2005, the Administrator issued a decision reversing the PRRB's decision, and concluding that the PRRB did not have jurisdiction over the CIB issue and that, in any event, Select Specialty did not qualify for a CIB.  See AR 2-9. The Plaintiff Select Specialty then timely filed a suit challenging the final decision of the Secretary, the Administrator's decision.

## ARGUMENT

### I.    A Narrow Standard of Judicial Review Governs This Action, and the Secretary's Final Agency Decision is Entitled to Substantial Deference

A narrow, deferential standard of review governs this case.  Jurisdiction over this action is based exclusively on 42 U.S.C. § 1395oo(f)(1), which provides for judicial review of final agency decisions on Medicare provider reimbursement disputes under the terms of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  See Memorial Hosp./Adair County Health Ctr., Inc. v. Bowen, 829 F.2d 111, 116-17 (D.C. Cir. 1987).  The APA standard of review, 5 U.S.C. § 706(2)(A), (E), provides that agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or

- 12 -

"unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413-15 (1971); Adair County, 829 F.2d at 116-17. The APA establishes a "narrow" standard of review, and "a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983). See FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 803 (1978).

Under the arbitrary and capricious standard, a court may invalidate an agency action only if it is "not rational and based on consideration of the relevant factors." See National Citizens Comm. for Broadcasting, 436 U.S. at 803. See also Motor Vehicle Mfrs. Assoc., 463 U.S. at 43. The substantial evidence standard is satisfied if the final agency decision is supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966), quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938). See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Consolo, 383 U.S. at 620 (citations omitted). In applying the substantial evidence standard, the reviewing court may not "displace the . . . [Secretary's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

It is well established that "[a] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." See, e.g.,

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-83 (1984) ("Chevron").  Furthermore, the Secretary's interpretation of her own regulations is entitled to "substantial deference," and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (citations omitted); Tenet HealthSystems HealthCorp. v. Thompson, 254 F.3d 238, 243-44 (D.C. Cir. 2001) (observing that "we must defer to HHS' reading of its own regulations, unless that reading is 'plainly erroneous or inconsistent with the regulation[s].'") (internal citations omitted); see also Sec'y of Labor v. Twentymile Coal Co., 411 F.3d 256, 260 (D.C. Cir. 2005); S.A. Storer and Sons Co. v. Secretary of Labor, 360 F.3d 1363, 1368 & n. 12 (D.C. Cir. 2004); S.G. Loewendick & Sons, Inc. v. Reich, 70 F.3d 1291, 1294 (D.C. Cir. 1995).  In other words, courts must defer to the Secretary's interpretation of a regulation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."  See Thomas Jefferson Univ., 512 U.S. at 512 (internal citation omitted); see also S.G. Loewendick & Sons, Inc., 70 F.3d 1291 at 1294.  "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'"  See Thomas Jefferson Univ., 512 U.S. at 512 (internal citation omitted).  The substantial deference owed to the Secretary's final decision is in no way lessened by the contrary prior decision of the PRRB.  See Homan & Crimen, Inc. v. Harris, 626 F. 2d 1201, 1211 (5th Cir. 1980).

- 14 -

Courts afford substantial deference to agency interpretations of ambiguous statutes and regulations irrespective of whether the interpretations have been set forth through rulemaking or adjudication.  See, e.g.,  S.E.C. v. Zandford, 535 U.S. 813, 814 122 S.Ct. 1899, 1900 (2002) (observing that "[t]his [agency] interpretation of the statute's ambiguous text in the context of formal adjudication is entitled to deference.") (internal citation omitted); United States v. Mead Corp., 533 U.S. 218, 229-230, 121 S.Ct. 2164, 2173 & n. 12 (2001) (noting that "the overwhelming number of our cases applying Chevron deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication" and, in a footnote, listing eight examples of cases in which the Supreme Court accorded this deference to interpretations set forth in adjudications) (emphasis added); Alaska Dep't of Health and Social Servs. v. Centers for Medicare & Medicaid Servs., 424 F.3d 931, 938-939 (9th Cir. 2005) (extending Chevron deference to the Secretary's interpretation of the Medicaid statute, which was reached in a formal case adjudication); HCA Health Services of Oklahoma, Inc. v. Shalala, 27 F.3d 614, 616-17 (D.C. Cir. 1994) (noting that "[i]n examining the [Provider Reimbursement Review] Board's construction of the Secretary's duly promulgated regulations, . . .  "the ultimate  is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." and that also "'[to] the extent [the Board's interpretation is] based . . . on the language of the Medicare [Statute] itself," we examine the decision with the appropriate deference due to an agency that has been charged with administering the Statute.") (citing Chevron, among other authorities).

Judicial deference is even owed to an agency or agency tribunal's interpretations of a jurisdictional provision.  See , e.g., Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S.

- 15 -

449, 453 (1999) (extending deference under Chevron to the Secretary's construction that a fiscal intermediary's refusal to reopen a cost report is not an appealable "final determination" of Medicare payment under 42 U.S.C. § 1395oo(a)); see also Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 380-81, 108 S.Ct. 2428, 2444 (1988) (S. Scalia, Concurring Opinion) (observing that "it is settled law that the rule of [Chevron] deference applies even to an agency's interpretation of its own statutory authority or jurisdiction" and that "it is plain that giving deference to an administrative interpretation of its statutory jurisdiction or authority is both necessary and appropriate.") (internal citations omitted); Detroit Edison Co. v. F.E.R.C, 334 F.3d 48, 53 (D.C. Cir. 2003) (noting that the "FERC's interpretation of its own statutory jurisdiction is entitled to Chevron deference.") (internal citation omitted); Wildberger v. Federal Labor Relations Authority, 132 F.3d 784, 790 (D.C. Cir. 1998) (citing Chevron, among other authorities ,for the proposition that "[w]e defer to the FLRA's construction of its enabling statute, including its interpretation of its statutory jurisdiction, so long as it is reasonable and not contrary to congressional intent") (internal citations omitted); Oklahoma Natural Gas Co. v. FERC, 28 F.3d 1281, 1283-84 (D.C. Cir.1994) (citing numerous authorities in support of the proposition that the "Supreme Court has in practice deferred" under Chevron to agency interpretations of statutes "even on jurisdictional issues," noting that "[s]o have we," and concluding that [h]ence, we review FERC's interpretation of its authority to exercise jurisdiction over transportation with the familiar Chevron framework in mind.") (internal citations omitted); HCA Health Services of Oklahoma, Inc. v. Shalala, 27 F.3d 614, 616-17 & 619-22 (D.C. Cir. 1994) (according substantial deference to the PRRB's interpretations of the regulations governing its own jurisdiction).

## II.    THE SECRETARY REASONABLY CONCLUDED THAT THE PRRB LACKED JURISDICTION BECAUSE SELECT SPECIALTY FAILED TO SATISFY THE STATUTORY "DISSATISFACTION" REQUIREMENT.

### A.    The Supreme Court's Decision in <u>Bethesda</u> Supports the Secretary's Interpretation of Section 1395oo(a)'s "Dissatisfaction" Requirement.

Section 1395oo(a)(1)(A)(i) requires that a provider be "dissatisfied . . . with a final

determination . . . as to the amount of total program reimbursement due" the provider.  <u>See</u> 42

U.S.C. § 1395oo(a)(1)(A)(i).  In the Secretary's final decision, he concluded that Select Specialty

had failed to meet the dissatisfaction requirement, which is a jurisdictional prerequisite to PRRB

jurisdiction.  <u>See</u> AR 2-9; 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835, 405.1841(a).  This

Court should uphold that conclusion because it was based on a reasonable interpretation of the

statutory and regulatory language governing PRRB jurisdiction.  It is undisputed that Select

Specialty neither claimed a CIB on its cost report nor "self-disallowed" a CIB under protest.[3]

Rather, the issue disputed is whether Select Specialty's failure to claim the CIB in its cost report

---

[3]  <u>See, e.g.</u>, Plaintiff Houston Heights' Memorandum In Support of its Motion For Summary Judgment ("Pl.'s Opening Brf.") (Docket No. 14-2) at 1 (conceding that "Houston Heights had not performed the full worksheet computation needed to claim the CIB in its cost report"), 7 (acknowledging that "Plaintiff had not initially populated all lines necessary in its cost report to calculate the bonus"), 12 (admitting that "the provider did not populate all lines in its cost report necessary to calculate the CIB"); AR 3, 6, 26, 33, 106, 125, 127, 130 (transcript page 31) (PRRB testimony of Wade Snyder, the reimbursement director of Select Specialty that Select Specialty "could have made a claim" for the CIB, but did not do so), 131 (transcript page 34, testimony of Mr. Snyder that there was noting "prohibiting . . . [Select Specialty] from claiming the CIB . . . on Line 58.01" and that "[t]o be honest, of course, I wish I had . . . I wish I would have populated that"), 131 (transcript page 35, testimony of Mr. Snyder that noone "bar[red] him from claiming the CIB"), 132, 134 (transcript page 45, admission by Mr. Synder that "the data was there and available" for him to "have calculated the CIB" in Select Specialty's as filed cost report."), 134 (transcript pages 47-48) (testimony that "I could have [claimed a CIB], oh absolutely . . . again, I wish I had"), 151-52, 158, 290.

precludes it from showing "dissatisfaction" with the intermediary's determination to not award a CIB.

      The Secretary's decision comports with the Supreme Court's ruling in <u>Bethesda Hospital Ass'n v. Bowen</u>, 485 U.S. 399 (1988) ("<u>Bethesda</u>"), which recognized that providers that neglect to claim all the costs to which they are entitled in their cost reports may not meet the jurisdictional requirement of being "dissatisfied." It is also strongly supported by the Seventh Circuit's holding in <u>Little Company of Mary Hospital and Health Care Ctrs. v. Shalala</u>, 24 F. 3d 984 (7th Cir. 1994) ("<u>Little Co. I</u>"). We will demonstrate that Plaintiff's attempts to distinguish <u>Little Co. I</u> are unavailing. We also show that Plaintiff errs in relying on 42 U.S.C. § 1395oo(d) and the First Circuit's flawed reasoning in <u>MaineGeneral Med. Ctr. v. Shalala</u>, 205 F. 3d 493 (1st Cir. 2000) ("<u>MaineGeneral</u>"). Finally, we explain that the Secretary's interpretation of the statute and regulations governing the PRRB's jurisdiction is in keeping not only with their language and the Supreme Court's interpretation of that language, but also with congressionally-mandated principles of exhaustion, allocation of responsibilities between the intermediaries and the Board, and finality.

      Plaintiff asserts that the Supreme Court's <u>Bethesda</u> decision establishes that the Secretary is not entitled to "<u>Chevron</u> deference" in his interpretation of 42 U.S.C. § 1395oo(a) because the provision is "unambiguous," and that the <u>Bethesda</u> decision supports Plaintiff's contention that a provider which has failed to claim allowable costs in its cost report may pursue the matter for the first time before the PRRB. <u>See</u> Pl.'s Opening Brf. at 10, 12-13. Plaintiff's position as to both of these matters is mistaken and relies on a fundamental misreading of the <u>Bethesda</u> decision.

      Plaintiff highlights the Supreme Court's statements in <u>Bethesda</u> that "[t]he plain meaning of the statute decides the issue presented" and that the "strained interpretation offered by the

Secretary is inconsistent with the express language of the statute." See Pl.'s Opening Brf. at 10, 13. However, Bethesda must be understood in its proper context. The Bethesda opinion was focused on a particular set of facts and a narrow legal issue, not presented in this case: "whether the Board may decline to consider a provider's [facial] challenge to one of the Secretary's regulations on the ground that the provider failed to contest the regulation's validity in the cost report submitted to its fiscal intermediary" or to claim the cost it sought in its cost report, and in that way failed to satisfy the jurisdictional "dissatisfaction" requirement, in a situation where the rule the provider sought to challenge was binding on the intermediary, non-discretionary, and clearly precluded reimbursement for the costs at issue. See Bethesda, 485 U.S. at 401, 404-05.

As the Bethesda court noted, the rule which the providers there sought to challenge, the Secretary's 1979 malpractice rule, imposed a clear, binding, nondiscretionary, legal limitation on reimbursement for hospitals' malpractice insurance costs. See Bethesda, 485 U.S. at 401 (noting that the rule "disallowed certain claims for malpractice insurance premium costs"), 404-05. The hospitals in Bethesda submitted cost reports in compliance with the 1979 rule, and then later requested a PRRB hearing to "challeng[e] the validity" of that rule and secure additional reimbursement under the pre-1979 methodology. Bethesda, 485 U.S. at 401-402, 404-05. In other words, the hospitals "effected, in the lexicon of the Medicare program, a 'self-disallowance' of malpractice insurance costs in excess of those allowed by the 1979 regulation." Id. at 401.

The Supreme Court in Bethesda agreed that, under 42 U.S.C. § 1395oo(a), "dissatisfaction" is a precondition to Board jurisdiction, but held that "the submission of a cost report in full compliance with the unambiguous dictates of the Secretary's rules and regulations

does not, by itself, bar the provider from claiming dissatisfaction with the amount of reimbursement allowed by those regulations." Id. at 404.  In view of the nature of the malpractice rule, and because fiscal intermediaries are confined to implementing applicable rules, the Supreme Court recognized that an attempt by the providers in that case to convince the fiscal intermediary to do otherwise would have been futile.  See Bethesda, 485 U.S. at 404 (explaining that "[p]roviders know that, under the statutory scheme, the fiscal intermediary is confined to the mere application of the Secretary's regulations, that the intermediary is without power to award reimbursement except as the regulations provide, and that any attempt to persuade the intermediary to do otherwise would be futile.").

After explaining why it would have been futile for the providers in Bethesda to file the costs they sought, the Supreme Court contrasted their situation with that of a different hypothetical provider who failed to claim reimbursement was available under the statute, regulations, manual provisions, and other policies that bind the fiscal intermediary, and strongly suggested that the statutory "dissatisfaction" requirement would not be met for such a provider. Specifically, the Bethesda Court explained that the providers in Bethesda

> stand on different ground than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules. While such defaults might well establish that a provider was satisfied with the amounts requested in its cost report and awarded by the fiscal intermediary, those circumstances are not presented here.

Bethesda at 404-405 (emphasis added).

The Supreme Court also definitively construed subsection (d), which provides that the Board can "make any other revisions on matters covered by such cost report . . . even though

- 20 -

such matters were not considered by the intermediary in making such final determination."  Id. at 405-406.  The Court held that subsection (d) "sets forth the powers and duties of the Board . . . once it obtains jurisdiction pursuant to subsection (a)."  Id. at 405.  For all these reasons, the Court "conclude[d] that petitioners could claim dissatisfaction . . . without incorporating their challenge in the cost reports filed with their fiscal intermediaries."  See Bethesda, 485 U.S. at 405.

Thus, in Bethesda the Supreme Court carved out a narrow futility exception to the "dissatisfaction" requirement, applicable only where a facial challenge to a rule was at issue and it would be unreasonable to demand that a provider claim reimbursement for an item in its cost report, prior to its request for PRRB review, because that item was so clearly not reimbursable under the applicable legal authorities that such an action could be deemed futile.  See Bethesda, 485 U.S. at 404-405.  Its holding was clearly limited to that circumstance.  See, e.g., Bethesda, 485 U.S. at 401 (indicating that "[t]his case requires us to decide whether the Board may decline a provider's challenge to one of the Secretary's regulations on the ground that the provider failed to contest the regulation's validity in the cost report submitted to its fiscal intermediary") (emphasis added), 404-05 (distinguishing this situation from the case where a provider fails to present claims to an intermediary and such actions are not futile).

In this case, by contrast with the situation presented in Bethesda, there was no binding statute, rule, or policy issuance that would have prevented the intermediary from exercising its discretion in an adjudication and awarding Plaintiff a CIB if the intermediary deemed it appropriate.  Thus, unlike the providers in Bethesda, Select Specialty cannot reasonably claim that it would have been "futile" for it to have included a claim for a CIB in its cost report before

it sought PRRB review.  Unlike the providers in <u>Bethesda</u>, who took advantage of the first non-futile opportunity that they had to raise the issue of the allowability of their malpractice costs and the legality of the malpractice rule, Select Specialty neither claimed a CIB, nor did it self disallow a CIB in its cost report.  Select Specialty simply failed to request payment for a CIB in its cost report and then raised the issue belatedly in its request for PRRB review.  Unlike the providers in <u>Bethesda</u>, Select Specialty has not brought a facial challenge to the "applicable rules" governing CIB eligibility.

Plaintiff argues that the passage in the <u>Bethesda</u> decision which identified the alternative hypothetical situation applicable to it does not indicate that "Board's statutory jurisdiction under 1395oo would be necessarily foreclosed under such circumstances," but rather that the language simply indicated that it might conceivably be.  <u>See</u> Pl.'s Opening Brf. at 13-14.  Even if this is true, the Supreme Court's dicta in this passage certainly suggests a result in those circumstances, that is consistent with precedent in this Circuit.  <u>See</u>, <u>e.g.</u>, <u>Athens Community Hosp., Inc. v. Schweiker</u>, 743 F.2d 1, 6 (D.C. Cir.1984) ("<u>Athens II</u>") (observing that "[w]e do not think Congress intended to permit a provider to claim dissatisfaction based upon its own failure to request reimbursement of a cost item" and that "[i]t simply is not plausible to contend that Congress has created a scheme where the provider can claim dissatisfaction and have recourse to an appeal procedure because the intermediary failed to read the provider's mind and anticipate all those things the provider would like to be reimbursed for, even though it did not request them."); <u>Saint Mary of Nazareth Hosp. Center v. Schweiker</u>, 741 F.2d 1447, 1449 (D.C. Cir. 1984) (noting that "[a]s <u>Athens II</u> makes clear, the PRRB's jurisdiction is limited to matters for which reimbursement was expressly requested" and "[b]ecause St. Vincent did not place in issue the

- 22 -

accounting treatment of the labor/delivery room patients in its cost report, the PRRB could not review it on its own motion").  The caselaw in this Circuit was not overturned by <u>Bethesda</u>.[4]

In any event, at the very least, the Supreme Court's observation that providers in such circumstances "might" fail to meet the "dissatisfaction" requirement establishes that § 1395oo(a)'s "dissatisfaction" requirement is ambiguous in the case of unclaimed costs, and accordingly should be analyzed by this Court under the second step of <u>Chevron</u>.  <u>See</u> <u>Chevron</u>, 467 U.S. at 842-44; <u>see also</u> <u>MaineGeneral</u>, 205 F.3d at 504 (Cyr., J., dissenting) (noting that the dictum in <u>Bethesda</u> Hospital "would seem – at the very least – to make it inarguable that reasonable minds might determine to treat [the] two categories of healthcare providers[, one of which simply neglected to claim a cost and one of which self-disallowed a cost that is not allowable under the Medicare regulations,] differently for jurisdictional purposes.").  Certainly, in light of the ambiguity in the "dissatisfaction" requirement recognized by the Supreme Court regarding unclaimed costs, the Secretary's interpretation of the statute must be accorded substantial deference under <u>Chevron</u>, and is reasonable.  <u>See</u> <u>Chevron</u>, 467 U.S. at 842-44.  Thus, Plaintiff is mistaken to suggest that <u>Bethesda</u> provides any support for the claim that 1395oo(a) is "unambiguous" on the issue of whether "providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which

_____

[4]  <u>See</u> <u>Abbott-Northwestern Hosp. v. Leavitt</u>, 377 F.Supp.2d 119, 132 & n. 9 (D.D.C. 2005) (observing that "the Board would have lacked jurisdiction over any appeal contending that the NPRs were flawed for failing to include unapproved exceptions to the RCLs" and referring to the "jurisdiction preclusion holding of <u>Athens Community Hospital</u>") (citing <u>Athens II</u>); <u>but see</u> <u>HCA Health Servs. of Okl. v. Shalala</u>, 27 F.3d 614, 621, n. 4 (D.C. Cir. 1994) (explaining that "the Supreme Court's decision in <u>Bethesda</u> . . .may have undercut the validity of the holdings in <u>St. Mary</u> and <u>Athens</u> which limited Board appeals from an NPR to cost items originally presented to the intermediary, . . . ").

they are entitled under applicable rules" satisfy the "dissatisfaction" requirement.  See Pl.'s

Opening Brf. at 10; Bethesda at 404-05.

Plaintiff cites a list of other cases which it alleges support its claim that the Secretary is

not entitled to Chevron deference in his interpretation of section 1395oo in this case.  See Pl.'s

Opening Brf. at 10.  None of them actually support Plaintiff's contention.  Washington Hospital

Center v. Bowen, 795 F. 2d 139, 144 (D.C. Cir. 1986) ("Washington Hospital"), for example, is

readily distinguishable.  At issue in that case was the proper interpretation of the 1983

amendments to 42 U.S.C. § 1395oo(a) which concerned the availability of PRRB appeals arising

in the PPS context.  See id. at 142 (observing that "[t]he 1983 amendments . . . altered the

statutory provision governing hospitals' appeals of PPS payment amounts to the PRRB," that

"[t]he new language provides for appeals by 'any hospital which receives payments in amounts

computed under [PPS]' and 'is dissatisfied with a final determination of the Secretary as to the

amount of payment under [PPS]'" and noting that "[t]he meaning of these amendments to

§ 1395oo (a) is the central issue in this appeal.")  The Court's ultimate ruling in that case was

limited to those specific provisions, and to the context of PPS appeals.  See, e.g., id. at 145

(noting that "[t]he effect of the new language in the opening paragraph of § 1395oo(a), contrary

to the Secretary's interpretation, is to eliminate the requirement that PPS recipients file a cost

report prior to appeal") (emphasis added).  That "new language" in 1395oo(a) is not the language

at issue in this case however, since Plaintiff is not "a PPS recipient," but rather is paid on a

reasonable cost methodology.  Thus, whether PPS hospitals must file a cost report before

appealing to the Board – the issue in Washington Hospital – has no relevance to the question

- 24 -

whether a provider such as plaintiff that <u>has</u> filed a cost report must claim a cost on that report

before requesting payment for the cost from the Board.

Moreover, in any event, <u>Washington Hospital</u> was decided two years before the Supreme

Court's <u>Bethesda</u> ruling.  To the extent that <u>Washington Hospital</u> can be read to suggest that

section 1395oo(a) is unambiguous on the issue of whether section 1395oo(a)'s "dissatisfaction"

requirement is satisfied by "providers who bypass a clearly prescribed exhaustion requirement or

who fail to request from the intermediary reimbursement for all costs to which they are entitled

under applicable rules," it was clearly reversed by the subsequently decided <u>Bethesda</u> decision,

which indicated that it "might well" not be satisfied in those situations.   <u>Bethesda</u> at 404-05.

## B.    The Seventh Circuit Has Upheld the Secretary's Interpretation of the Statutory Language.

The Seventh Circuit has held that the Board does not have jurisdiction where a provider

fails to claim all costs to which it is entitled.  <u>See</u> <u>Little Co. of Mary Hosp. & Health Care Ctrs. v.</u>

<u>Shalala</u>, 24 F.3d 984 (7th Cir. 1994) ("<u>Little Co. I</u>"); <u>Little Co. of Mary Hosp. & Health Care</u>

<u>Ctrs. v. Shalala</u>, 165 F.3d 1162 (7th Cir. 1999) ("<u>Little Co. II</u>").  In <u>Little Co. I</u>, the Seventh

Circuit recognized that "the teaching" of <u>Bethesda</u> is that a provider's failure to claim

reimbursement is tantamount to "a failure to exhaust" administrative remedies before the fiscal

intermediary, which precludes the provider from establishing that it is dissatisfied with the

intermediary's final determination of total program reimbursement.  <u>See</u> <u>Little Co. I</u>, 24 F.3d at

992.

Plaintiff argues that <u>Little Co. I</u> is distinguishable from this case because in that case, "the

hospital had received PPS payments, not cost based reimbursement like [Select Specialty]" and

because that case involved a consideration of a regulation which is irrelevant to this case.  <u>See</u>

Pl.'s Opening Brf. at 18.  In fact, while a portion of the <u>Little Co. I</u> decision was devoted to the

validity of the regulation, in a freestanding portion of the decision the Seventh Circuit observed

that the <u>Bethesda</u> decision (which arose in the reasonable cost context) contains language that

"strongly suggests a hospital that does not ask its intermediary to reimburse it for all of the costs

for which it is entitled to be reimbursed cannot, on appeal to the Board, first ask for new costs."

<u>Id</u>. at 993.  Applying this language, the <u>Little Co. I</u> court noted that the provider's failure to

"appeal its original PPS payment," coupled with its failure to appeal an earlier payment, "estops

Little Company from now claiming to be 'dissatisfied.'"  <u>Id</u>. at 993.  Any remaining doubt about

whether the <u>Little Co. I</u> court understood its decision apply only in the PPS context is eliminated

by the fact that, in an immediately subsequent footnote, the court went out of its way to "note that

the 'dissatisfaction' requirement appears twice in the statute: once referring to appeals from year-

end NPRs (§ 1395oo(a)(1)(A)(i)), and once again referring to appeals from PPS payments

(§ 1395oo(a)(1)(A)(ii))."  <u>Id</u>. at 993, n. 8.  The first of the two provisions the Court cited covers

reasonable cost appeals to the Board.

Plaintiff's attempt to distinguish <u>Little Co. I</u> is also undercut by the fact that the Seventh

Circuit further applied the "teaching" it referenced in <u>Little Co. I</u> in a subsequent case, <u>Little Co.</u>

<u>II</u>.  In that case, a provider which had " incurred a large loss on the refunding of its debt and a

much smaller loss on the sale of some land that it owned," but in its cost report "[t]he hospital

did not mention the land loss."  <u>See</u> <u>Little Co. II</u>, 165 F.3d at 1165.  The provider appealed to the

PRRB on an unrelated ground and then while before the PRRB "changed its position," arguing

for the first time that it should be able to "deduct the land loss from its 1988 investment income."

Id. at 1165. "[T]he hospital pointed out that it was dissatisfied, albeit not on the ground that it had presented to the intermediary," but the PRRB "ruled that the hospital couldn't switch grounds, because this would mean bypassing the fiscal intermediary." Id. at 1665. The Seventh Circuit rejected the hospital's argument that it had shown "dissatisfaction," stating that "while the statute is curiously worded, the intent is plain that the provider must give the intermediary a first shot at the issue, provided the issue is within the intermediary's competence, as the issue of deducting the land loss against the investment income was because it did not involve an issue of policy," relying in part on Bethesda, Little Co. I, and the language of the statute. See Little Co. II, 165 F.3d at 1165. Significantly, the Little Co. II decision did not involve the regulation at issue in Little Co. I, which Plaintiff argues provides a basis for distinguishing that decision. Clearly that effort must fail and the teachings of Little Co. I and Little Co. II apply squarely in the situation presented here.

### C. Neither Section 1395oo(d) Nor The First Circuit's MaineGeneral Decision Undercuts the Secretary's Reasonable Interpretation.

Apart from its interpretation of § 1395oo(a), Plaintiff argues that the text of 42 U.S.C. § 1395oo(d) supports its claim that "the Board has statutory jurisdiction to hear the Plaintiff's challenge" and claims that the Supreme Court's holding in Bethesda supports that assertion. See Pl.'s Opening Brf. at 14-15. Section 1395oo(d) provides that "[t]he Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination."

In fact, as the Supreme Court held in <u>Bethesda</u>, and the Court of Appeals in this Circuit

has recognized, section 1395oo(d) is not jurisdictional.  Rather, it merely "sets forth the powers

and duties of the Board . . . once it obtains jurisdiction pursuant to subsection (a)."  <u>See</u> <u>Bethesda</u>

<u>Hospital</u>, 485 U.S. at 405-406; <u>see also</u> <u>HCA Health Services of Oklahoma, Inc. v. Shalala</u>, 27

F.3d 614, 617 (D.C. Cir. 1994) (observing that "[a]s the Supreme Court held in <u>Bethesda</u>, . . .

"[t]his language [in section 1395oo(d)] allows the Board, once it obtains jurisdiction pursuant to

subsection (a), to review and revise a cost report with respect to matters not contested before the

fiscal intermediary"); <u>French Hosp. Med. Ctr. v. Shalala</u>, 89 F.3d 1411, 1418, n. 9 (9th Cir. 1996)

("French Hospital") (observing that "§ 1395oo(d) not only does not expand the PRRB's

jurisdiction, it has <u>nothing whatsoever to do with the PRRB's jurisdiction</u>" but "[i]nstead . . . §

1395oo(d) governs the PRRB's <u>scope of review</u>.") (emphasis in original).  The Secretary

reasonably interprets § 1395oo(d) as empowering the Board "to adjust the cost report in certain

circumstances to facilitate the remedies it imposes," but only as to the particular reimbursement

issues that independently meet subsection (a)'s dissatisfaction, timely filing, and amount in

controversy requirements for Board jurisdiction.  <u>See</u> <u>Little Co. of Mary Hosp. & Health Care</u>

<u>Ctrs. v. Shalala</u>, 828 F. Supp. 570, 576 (N.D. Ill. 1993), aff'd 24 F.3d 984 (7th Cir. 1994).

For the same reason, the First Circuit's decision in <u>MaineGeneral</u>, a two-to-one decision,

is flawed, and this Court should reject Plaintiff's invitation to rely upon it.  <u>See</u> Pl.'s Opening

Brf. at 10, 14-18.  The <u>MaineGeneral</u> majority held that it was bound by the First Circuit's pre-

<u>Bethesda</u> decision in <u>St. Luke's Hospital v. Secretary of Health and Human Services</u>, 810 F.2d

325 (1st Cir. 1987) ("St. Luke's"), even though the jurisdictional analysis in <u>St. Luke's</u> was

based on 1395oo(d), and thus was inconsistent with the analysis subsequently adopted by the

Supreme Court in Bethesda.  See St. Luke's, 810 F.2d at 325-26 (noting at the outset that "[t]he

legal issue before us concerns the proper interpretation of a statute that describes the Board's

powers on review," and citing section 1395oo(d)"); see also MaineGeneral, 205 F.3d at 503

(Cyr., J., dissenting) (noting that "in St. Luke's we focused exclusively upon section

1395oo(d).")  St. Luke's did not even mention section 1395oo(a)'s "dissatisfaction" requirement

in its legal analysis, which the Supreme Court later held in Bethesda to be a requirement for

Board jurisdiction.  See MaineGeneral, 205 F.3d at 503 (Cyr., J., dissenting) (observing that in

St. Luke's, "we addressed neither section 1395oo(a) nor its 'dissatisfaction' criterion, which is a

threshold jurisdictional provision") (emphasis in original); Bethesda, 485 U.S. at 404.

     Nevertheless, the majority in MaineGeneral held that it was bound by St. Luke's,

reasoning that St. Luke's had not relied on section 1395oo(d) alone, but also on legislative

history, the nature of judicial and administrative appellate bodies, other subsections of 1395oo

(such as subsection (f)), and special features of Board review.  See Maine General, 205 F.3d at

498.  The majority also reasoned that Bethesda did not rely on section 1395oo(a) alone.  It found

that Bethesda "makes nothing of the possible distinction between 'subsection (a)' and

'subsection (d)' cases," but examines section 1395oo "as a whole," including subsection (d).

MaineGeneral, 205 F.3d at 498-499.  Accordingly, the MaineGeneral court concluded, Bethesda

did not affect the analysis employed by St. Luke's, and the court was bound by the holding in St.

Luke's that the Board had jurisdiction over unclaimed costs.  In so holding, the majority in

MaineGeneral explicitly relied on subsection (d).  It ruled that the costs at issue were "a matter

covered by a cost report," and that no deference was due to the Secretary's interpretation because

subsection (d) is not ambiguous.  Id. at 499.  Most significantly, the MaineGeneral court did not

even address whether the provider in MaineGeneral had shown "dissatisfaction."

      The MaineGeneral analysis thus is fatally flawed because it completely ignores the

Supreme Court's holding in Bethesda that jurisdiction lies exclusively under subsection (a), and

that subsection (d) merely "sets forth the powers and duties of the Board . . . once it obtains

jurisdiction pursuant to subsection (a)."  See Bethesda, 485 U.S. at 405-406.  By relying on a pre-

Bethesda Hospital opinion that determined Board jurisdiction based on section 1395oo(d) rather

than section 1395oo(a), the MaineGeneral court ultimately did not even require a showing of

dissatisfaction.  Instead, it incorrectly allowed the provider to "use Section 1395oo(d) to

bootstrap an untimely challenge or claim into the Section 1395oo(a) appeals process."  Little Co.

of Mary Hosp. & Health Care Ctrs. v. Shalala, 994 F. Supp. 950, 962 (N.D. Ill. 1998), aff'd 165

F.3d 1162 (7th Cir. 1999).

      Moreover, the majority in MaineGeneral did not deem it significant that the provider in

that case had inadvertently left the costs off its cost report, as opposed to self-disallowing them,

as had the providers in St. Luke's and Bethesda.  See MaineGeneral, 205 F.3d at 497-498.  The

majority noted that the St. Luke's decision did not put any weight on the fact that the provider

had self-disallowed the costs.  Ibid.  But here is where it makes a crucial difference that the

MaineGeneral and St. Luke's courts failed to analyze jurisdiction using the "dissatisfaction"

requirement.  Whether a cost was omitted from a cost report because including it would be futile,

or whether it was omitted out of negligence, arguably would make no difference in determining

whether a cost is "covered by [a] cost report" under subsection (d).  A cost may be either covered

or not covered by a cost report regardless of the reason for not including it.  But that distinction

would make a significant difference in determining whether a provider is "dissatisfied" with its reimbursement under subsection (a), which is the correct basis for determining jurisdiction. A provider that self-disallows costs because claiming them would be futile is "dissatisfied," unlike a provider that simply fails to claim a cost.

Importantly, the MaineGeneral court did not address the language in Bethesda, 485 U.S. at 404-05, distinguishing providers that self-disallowed their unallowable costs from those that simply failed to request costs except to state that it was dictum. See MaineGeneral, 205 F.3d at 499. But, as recognized by the dissent in that case, this dictum "would seem – at the very least – to make it inarguable that reasonable minds might determine to treat [the] two categories of healthcare providers differently for jurisdictional purposes." See MaineGeneral, 205 F.3d at 504 (Cyr., J., dissenting).

Finally, of course this Court is not even arguably bound by St. Luke's, as the MaineGeneral majority believed itself to be. Nor is it bound by MaineGeneral. For all these reasons, this Court should reject the holding of MaineGeneral.

### D.    Exhaustion Principles, The Proper Allocation Of Responsibilities Between The Intermediaries And The Board, And Principles of Finality Favor The Secretary's Interpretation.

As explained above, the Seventh Circuit recognized in Little Co. I that the "the teaching" of Bethesda Hospital is that a provider's failure to claim reimbursement (as opposed to self disallowing a claim) is tantamount to "a failure to exhaust" administrative remedies before the fiscal intermediary, which should preclude the provider from arguing that it is dissatisfied with the intermediary's final determination of total program reimbursement. Little Co. I, 24 F.3d at

992.  Indeed, allowing the provider to bypass the intermediary in the manner Select Specialty did could have dire consequences on the Medicare payment system.

Determining a provider's Medicare reimbursement is an extremely time-consuming, fact-intensive process.  The provider submits a cost report providing information as to all facets of its operations.  The fiscal intermediary then undertakes the lengthy process of reviewing the report and auditing it.  In many cases, the intermediary itself will allow the reimbursement claimed in the provider's cost reports, thereby obviating the need for review by the PRRB and the federal courts.  Thus, requiring a provider to expressly claim costs in its cost report will result in fewer Board appeals and less federal court litigation.  This requirement also ensures that, even where there is a challenge to the fiscal intermediary's application of Medicare policy, the costs at issue in the appeal will have been properly audited by the intermediary before the matter is litigated before the PRRB and, thus, that there will be an adequate factual record for the Board to review. Avoidance of litigation and facilitation of a complete record for any appeals and judicial review are two of the settled underpinnings of the doctrine of exhaustion of administrative remedies. See Weinberger v. Salfi, 422 U.S. 749, 765 (1975).

The Secretary's interpretation fosters the important administrative policy of "maximizing [providers'] use of the intermediary's expertise in cost assessment, as well as their utilization of the intermediary's investigatory resources." MaineGeneral, 205 F.3d at 504 (Cyr, J., dissenting); see also Battle Creek v. Leavitt, 5:05Cv00053 (E.D. Mich. October 26, 2006)(copy attached) (endorsing the Secretary's interpretation of 42 U.S.C. §1395oo and Bethesda, citing Athens II with approval, and agreeing with the dissent in MaineGeneral).  Indeed, as its very name indicates, the Provider Reimbursement Review Board, which only has five members, 42 U.S.C.

- 32 -

§ 1395oo(h), was intended by Congress to "[r]eview" the determinations of fiscal intermediaries. The Board would be overwhelmed if providers were permitted to "appeal" all previously unclaimed costs that the intermediaries might have reimbursed if the providers had simply claimed them in their cost reports.

Moreover, there is no reason to think that appeals of non-reported costs would be the "exception" rather than the "rule" if the Plaintiff's interpretation is adopted. It would create perverse incentives for providers to file appeals before the Board raising issues that they might not otherwise dispute in order to create time for the providers to determine whether there are any costs that they negligently failed to claim in their cost reports. Such "placeholder" appeals would allow providers to do an end-run around the requirement that cost reports not be reopened more than three years, see 42 C.F.R. § 405.1885, and then only at the discretion of the fiscal intermediary. If a provider can raise an unclaimed cost at any time during the appeal process, there would be no reason for a provider with a pending appeal to seek discretionary reopening from a fiscal intermediary. Furthermore, providers could appeal costs after the three-year period required for reopening, so long as a PRRB appeal were pending. Such conduct would thwart the principle of finality embodied in the three-year limit on reopenings.

Protecting this interest in finality was an essential underpinning of the decisions in which the D.C. Circuit and Ninth Circuit sustained the Secretary's interpretation that appeals to the Board following a cost report reopening and revised NPR are limited to the specific reimbursement matters that were reconsidered by the intermediary. See HCA Health Servs. of Okl. v. Shalala, 27 F.3d 614, 620-621 (D.C. Cir. 1994); see also French Hospital, 89 F.3d at 1420; Accord Anaheim, 130 F.3d at 852. Under Plaintiff's interpretation, providers could

belatedly raise new issues "at the last minute" as long as an appeal is pending before the PRRB, thereby prolonging even further the time in which appeals before the PRRB are resolved and also thereby draining the intermediary's and the Board's resources.

Plaintiff's interpretation would also result in de facto extensions of time for filing accurate cost reports.  Cf. 42 C.F.R. § 413.24(f)(2) (five-month deadline for submission to intermediary of perfected cost report).  By requiring providers to claim reimbursement in their Medicare cost reports, the Secretary's interpretation gives "providers an incentive to prepare their cost reports with care."  MaineGeneral, 205 F.3d at 504 (Cyr, J., dissenting).  Without this requirement, providers may file incomplete cost reports with the knowledge that they can always seek corrections later.

Furthermore, Plaintiff's interpretation would make Board jurisdiction over a particular issue turn on the happenstance of whether a provider was dissatisfied with some other aspect of its reimbursement.  Two similarly situated providers could discover four years after the fact that they made identical mistakes on their cost reports.  The one that had an appeal pending before the Board on some other issue could have its mistake corrected, while the one that did not have a pending appeal would be barred.  This result makes no sense.

Plaintiff's interpretation of the statutory language also conflicts with the reality of cost-reporting and fiscal intermediary determinations.  An intermediary makes distinct reimbursement determinations for each expense item, and then simply sums these distinct determinations to come up with the total amount of program reimbursement.  Thus, to the extent a provider is dissatisfied with its reimbursement, it is dissatisfied with one or more distinct components of it.  Providers rarely, if ever, challenge every discrete element of reimbursement included in the NPR.

In the event of such an all-encompassing appeal, the Secretary would still insist on a cost report claim for each allowable cost. Indeed, the Secretary's regulations similarly require the provider's Board hearing request to identify the specific "aspects of the determination with which the provider is dissatisfied." 42 C.F.R. § 405.1841(a)(1).

Accordingly, not only does the Secretary's interpretation of 42 U.S.C. § 1395oo(a)(1)(A)(i) and (d) comport with the statutory language and the Supreme Court's interpretation of that language, it also advances the important policy interests of (1) promoting the integrity of the cost-reporting and appeal process, (2) properly allocating responsibilities between fiscal intermediaries and the PRRB, and (3) fostering principles of finality.

The foregoing discussion demonstrates that the Secretary has correctly construed the statutory requirement that a provider be "dissatisfied" with the intermediary's decision. To prevail, however, the government need not convince this Court that the Secretary's construction is the one this Court would adopt if it were to view the matter de novo. As noted above, the Secretary found that Select Specialty could not be "dissatisfied" with the Intermediary's determination on the CIB issue in the NPR because its cost report did not claim reimbursement for this plainly allowable item. This interpretation comports with the ordinary meaning of "dissatisfied" and is consistent with the statute and regulations. It thus should be sustained as a permissible construction entitled to substantial deference under Chevron and Thomas Jefferson. See Chevron, 467 U.S.at 842-44; Thomas Jefferson Univ., 512 U.S. at 512.

**III.    The Secretary Reasonably Concluded that Select Specialty Did not Qualify For a CIB Because it Did not File Three "Full" 12 Month Cost Reports as a LTCH Prior to the Cost Year in Which it has Sought a CIB**

A.    **The Legislative History of the BBA Supports the Secretary's Interpretation of the Statutory Language**

The legislative history directly supports the Secretary's interpretation of the phrase "full cost reporting period" in this case.  In enacting the BBA, Congress understood that the term "full cost reporting period," which appears in the CIB provision, connoted a 12-month cost reporting period, and recognized that the 12-month cost reporting periods were more reflective of a provider's actual costs.

When Congress promulgated the CIB as part of the BBA, it provided elsewhere in the BBA that for purposes of ascertaining the total number of full-time equivalent residents for purposes of calculating a hospital's indirect graduate medical education payment, "[i]f any cost reporting period beginning on or after October 1, 1997, is <u>not equal to twelve months</u>, the Secretary <u>shall make appropriate modifications to ensure</u> that the average full-time equivalent resident count . . . is based on the equivalent of <u>full twelve-month</u> cost reporting periods."  <u>See</u> 143 Cong. Rec. H6029-01, 1997 W.L. 424974 (July 29, 1997) at *H6088 (Conference Report on H.R. 2015, Balanced Budget Act of 1997, discussion of section 4621) (emphasis added); 143 Cong. Rec. H4416-01, 1997 W.L. 348212  (June 25, 1997) at.*H4533 (Congressional Record --- House of Representatives, section 10506, noting the presence of this language in the BBA sections concerning indirect graduate medical education);  <u>see also</u> 42 U.S.C. § 1395ww(d)(5)(B).  Similarly, in the "[d]irect [g]raduate [m]edical [e]ducation" context, the same Congress which enacted the BBA provided that "the total number of full-time equivalent residents for determining a hospital's graduate medical education payment shall equal the average of the actual full-time equivalent resident counts for the cost reporting period and the preceding

two cost reporting periods," but that there would be an "ADJUSTMENT FOR <u>SHORT</u>

<u>PERIODS</u>" inasmuch as "[i]f any cost reporting period beginning on or after October 1, 1997, is

<u>not equal to twelve months</u>, the Secretary <u>shall make appropriate modifications</u> to ensure that the

average full-time equivalent resident counts pursuant to clause (i) are based on the equivalent of

<u>full twelve-month</u> cost reporting periods."  <u>See</u> 143 Cong. Rec. H6029-01, 1997 W.L. 424974

(July 29, 1997) at *H6088 (Conference Report on H.R. 2015, Balanced Budget Act of 1997,

discussion of section 4623) (emphasis added) ; <u>see also</u> <u>id</u>. at *H6239 (noting that the house bill

contained this language); 143 Cong. Rec. H4416-01, 1997 W.L. 348212 at * H4471 (June 25,

1997) (Congressional Record --- House of Representatives, section 4731, noting the presence of

this language in the BBA sections concerning direct graduate medical education); <u>id</u>. at * H4542

(section 10731, referencing the same language); <u>see also</u> 42 U.S.C. § 1395ww(h)(4)(G)(ii)

(noting that "[i]f any cost reporting period beginning on or afte October 1, 1997, is not equal to

twelve months, the Sceretary shall make appropriate modifications to ensure that the average

full-time equivalent resident counts . . . are based on the equivalent of <u>full</u> twelve month cost

reporting periods.") (emphasis added).

It is well established that evidence in the form of such contemporaneous legislative

history can be used to resolve statutory ambiguity.  <u>See</u> <u>McCreary County, Ky. v. American Civil</u>

<u>Liberties Union of Ky.</u>, 545 U.S. 844, 125 S.Ct. 2722 (2005) (citing  <u>Edwards v. Aguillard</u>, 482

U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) for the proposition that "[t]he plain

meaning of the statute's words, enlightened by their context and the contemporaneous legislative

history, can control the determination of legislative purpose."); <u>Environmental Defense Fund v.</u>

<u>Reilly</u>, 909 F.2d 1497, 1502 (D.C. Cir. 1990) (noting that "[i]f . . . the language leaves the

meaning of the statute unclear, the court may enlist the aid of pertinent legislative history and other sources of legislative intent in an effort to resolve the ambiguity").  Here the legislative history of the BBA squarely supports the conclusion that Congress understood the term "full" to connote a 12 month period.

This conclusion is buttressed by the fact that in a subsequent statute, Congress distinguished between "full" 12 month cost reporting periods and partial cost reports.  See, e.g., 149 Cong. Rec. H11877-03, 2003 WL 22760574 at (Conference Report on H.R. 1, Medicare Prescription Drug and Modernization Act of 2003, section 705, indicating that "[t]he Medicare Payment Advisory Commission shall conduct a study of payment margins of home health agencies under the home health [PPS]" and that "the study shall use the partial or full-year cost reports filed by home health agencies.")

**B.      The Secretary's Final Decision was Based on a Reasonable and Consistently Held Reading of the Secretary's Own Regulations and Manual Provisions.**

Furthermore, consistent with the statute[5], the Secretary's regulations which define the terms "target amount," "trended costs," and "expected costs," use language which is replete with references to "12 month" and "full" cost reporting periods, as well as language which draws an explicit distinction between such full 12 month cost reporting periods and shorter cost reporting

---

[5]  Congress defined the CIB eligibility criteria using formulas expressed in terms of "12 month" cost reporting periods and "fiscal year[s]."  See 42 U.S.C. §§ 1395ww(a)(4) (defining "operating costs of inpatient hospital services"), 1395ww(b)(2)(C) (defining "trended costs"), 1395ww(b)(2)(D) (defining "expected costs"), 1395ww(b)(3)(A) (defining "target amount"), 1395ww(b)(3)(B) (defining "applicable percentage increase"), 1395ww(b)(3)(B)(iii) (defining "market basket percentage increase").

periods and expresses greater confidence in the accuracy and representative nature of full cost

reporting periods than short ones.[6]

Moreover, in connection with other parts of the Medicare program, the Secretary has

frequently and consistently used the term "full" to refer to 12 month cost reporting periods, used

the two terms interchangeably, and distinguished such "full" cost reporting periods from "partial"

or "short" cost reporting periods which reflect a shorter period.[7]  The Secretary has done the

_____

[6]  See, e.g., 42 C.F.R. § 413.40(a)(3), 413.40(b)(1) (explaining that "[e]ach hospital's
target amount is based on its allowable net inpatient operating costs per case from the cost
reporting period of at least 12 months immediately preceding the first cost reporting period
subject to the rate-of-increase ceiling established under this section," that "[i]f the immediately
preceding cost reporting period is a short reporting period (fewer than 12 months), the first
period of at least 12 months subsequent to that short period is the base period.") (emphasis
added), 413.40(d)(5)(A), 413.40(d)(5)(B) (defining trended costs with language essentially
identical to that found in the statute: "[f]or a hospital for which its cost reporting period ending in
fiscal year 1996 was its third or subsequent full cost reporting period, trended costs are the lesser
of the allowable inpatient operating costs per discharge or the target amount for the cost reporting
period ending in fiscal year 1996, increased in a compounded manner for each succeeding fiscal
year by the market basket percentage increase" and that, "[f]or all other hospitals, trended costs
are the allowable inpatient operating costs per discharge for its third full cost reporting period
increased in a compounded manner for each succeeding fiscal year by the market basket
percentage increase for the fiscal year.") (emphasis added), 413.40(d)(5)(iii) (noting "[t]he
hospital's expected costs are the lesser of its allowable inpatient operating costs per discharge or
the target amount per discharge for the previous cost reporting period updated by the market
basket increase.").

[7]  See, e.g., 42 C.F.R. §§ 412.23(b)(8) (refers to the "first full 12-month cost reporting
period"), 412.30 (a) (indicating that "[a] decrease in bed capacity in a rehabilitation unit must
remain in effect for at least a full 12-month cost reporting period before an equal or lesser
number of beds can be added to the hospital's licensure and certification . . .") (emphasis added),
412.30(b)(3) (referring to the "first full cost reporting period" in this sane context), 413.30(b)(4)
(same), 412.75(a)(2)(i) (noting in the PPS context, that "[i]f the hospital's last cost reporting
period ending before September 30, 1988 is for less for less than 12 months, the base period is
the hospital's most recent 12-month or longer cost reporting period ending before the short period
report"), 412.77(b)(ii) ("if that cost reporting period is for less than 12 months, the base period is
the hospital's most recent 12-month or longer cost reporting period ending before the short cost
reporting period");

same thing in preamble language in proposed and final rules.[8]  Moreover, the Secretary's manual

provisions distinguish between "full" 12 month cost reports and "shorter" cost reports.  See, e.g.,

---

[8]  See, e..g., 71 Fed. Reg. 23996-01, 2006 W.L. 1068720 (Apr. 25, 2006) at *24113
(proposed rule concerning the "Proposed Changes to the Hospital Inpatient Prospective Payment
Systems and Fiscal Year 2007 Rates" and Per Resident Amounts ("PRAs") for New Teaching
Hospitals, explaining that "[w]e note that, as with existing policy, the proposed base year need
not be a full cost reporting year" because"[e]ven where that cost reporting period may be a short
(less than 12 months) cost reporting period, we believe an appropriate PRA will be determined
since the number of FTEs [full time equivalents] will be commensurate with the costs incurred in
this short cost reporting period.") (emphasis added); 69 Fed. Reg. 25752-01, 2004 W.L. 972772
(May 7, 2004) at *25754 (final rule, noting, that, in a September 1, 1992 final rule, "we specified
that an [Inpatient Rehabilitation Facility] could submit a written certification that it would
comply with the 75 percent rule for both a partial cost reporting period of up to 11 months and
the subsequent full 12-month cost reporting period.") (emphasis added); 66 Fed. Reg. 37980-01,
2001 W.L. 814730 (July 20, 2001) at *37983 (final notice, observing that "[t]he concept of
converting a partial period into a full cost report period is found in the Medicare regulations at 42
CFR 413.86(g)(4) and (e)(5)(ii)."); 62 Fed. Reg. 45966-01, 1997 W.L. 529858 (Aug. 29, 1997) at
*46026 (final rule with comment period, noting that 42 C.F.R. § 412.30 provides that "[i]f a
hospital that has not previously participated in the Medicare program seeks exclusion of a
rehabilitation unit [from the PPS system], it may designate certain beds as a new rehabilitation
unit for the first full 12-month cost reporting period that occurs after it becomes a Medicare-
participating hospital") (emphasis added); 57 Fed. Reg. 39746-01, 1992 W.L. 209396 (Sept. 1,
1992) at *39799 (final rule, obverving that "[u]nder [42 C.F.R.] § 412.23(b)(8), a new
rehabilitation hospital may be provisionally excluded from the prospective payment system for
its first full 12-month cost reporting period of Medicare participation based on a written
certification that the patients it intends to serve meet the criteria for patients needing
rehabilitation services set forth in § 412.23(b)(2).") (emphasis added); id. at *39800 (observing
that "we have revised these final regulations to provide, in [42 C.F.R.] §§ 412.23(b)(8) and
412.30(a)(3), that the total period of provisional exclusion for a new rehabilitation hospital or for
the rehabilitation unit of a new hospital is the first full 12-month cost reporting period plus any
initial short cost reporting period which is not less than 1 month and not more than 11 months in
length.") (emphasis added); 57 Fed. Reg. 24961-01, 1992 W.L. 128130 (June 12, 1992) at
*24973 (final rule with comment period, noting that certain Federally Qualified Health Centers
may request an exception to the cost limits, but that "[t]his exception is limited to three cost
reporting periods ending August 31, 1995" and "[t]his may include 3 full year cost reports or a
combination of 1 partial and 2 full years.") (emphasis added); 57 Fed. Reg. 23618-01, 1992 W.L.
118535(June 4, 1992) at *23658 (proposed rule, observing that "[u]nder [42 C.F.R.]
§ 412.23(b)(8), a new rehabilitation hospital may be provisionally excluded from the prospective
payment system for its first full 12-month cost reporting period of Medicare participation based
on a written certification that the patients it intends to serve meet the criteria for patients needing
rehabilitation services set forth in 412.23(b)(2).") (emphasis added).

AR 191 (copy of section 102 of the Provider Reimbursement Manual ("PRM"), which indicates

that "[f]or cost reporting purposes, Medicare requires submission of annual reports covering a 12

month period of operations based upon the provider's accounting year," but that "[a] provider

may prepare a short period cost report for part of a year under the circumstances described in

[PRM] § 102.1 through 102.3"), 198 (noting that PRM § 3003.6C informs providers that an

example of a "full cost reporting period" might be one from "January 1 through December 31,

1993").  The consistency with which the Secretary has adhered to this interpretation of the term

"full cost reporting period" as synonymous with a 12 month period, over many years,

underscores the reasonableness of his similar conclusion here.  See Good Samaritan Hosp. v.

Shalala, 508 U.S. 402, 417, 113 S.Ct. 2151, 2161 (1993) (noting that "the consistency of an

agency's position is a factor in assessing the weight that position is due." and that "'[a]n agency

interpretation of a relevant provision which conflicts with the agency's earlier interpretation is

'entitled to considerably less deference' than a consistently held agency view.'") (internal

citations omitted).

### C.    Several Canons of Construction Support the Secretary's Interpretation of the Statutory and Regulatory Provisions Governing CIB Eligibility.

The fact that Congress and the Secretary have both consistently used the term "full" to

mean 12 months in a variety of contexts, suggest that each had a 12 month period in mind when

they used the word "full" in the CIB context.  See, e.g., Merrill Lynch, Pierce, Fenner & Smith,

Inc. v. Dabit, 126 S.Ct. 1503, 1513 (2006) (noting that "[g]enerally, 'identical words used in

different parts of the same statute are . . . presumed to have the same meaning.'") (internal

citation omitted); IBP, Inc. v. Alvarez, 546 U.S. 21, 126 S.Ct. 514, 523 (2005) (referencing the

"normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning") (citing <u>Sullivan v. Stroop</u>, 496 U.S. 478, 484, 110 S.Ct. 2499 (1990)).

Plaintiff's proposed interpretation of the regulatory and statutory phrase "3 full cost reporting periods" should be rejected because it would render the word "full" in that phrase mere surplusage, an impermissible result. <u>See</u>, e.g., <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) (internal citations omitted) (observing that "it is 'a cardinal principle of statutory construction' that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (internal citation omitted); <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001) (same). By arguing that "full cost reporting period" is not synonymous with a 12 month period, plaintiff would turn every cost reporting period, no matter how short into a "full cost reporting period" and this renders the word "full" in that phrase meaningless.

Furthermore, the Secretary's interpretation of the statutory and regulatory provisions governing eligibility for a CIB are reasonable because they are consistent with the dictionary definition of the word "full." <u>See</u> AR 207-08 (excerpt of Black's Law dictionary defining the term "full" in part as "complete" and "entire," and "perfect, . . . not wanting in any essential quality"); <u>Leocal v. Ashcroft</u>, 543 U.S. 1, 9, 125 S.Ct. 377, 382 (2004) (noting that "[w]hen interpreting a statute, we must give words their ordinary or natural meaning" (internal quotation marks omitted)); <u>Olds v. National Capital Management, Ltd.</u>, 1988 WL 130622 at * 3 (D.Kan. 1988.) (finding that "we will give the term 'total' its ordinary meaning: 'entire, full, complete, the whole amount.'") (citing Black's Law Dictionary at 1336) (emphasis added). Indeed, the

- 42 -

D.C. Circuit has recognized that a "full" cost reporting period is a 12 month period, and has distinguished full cost reporting periods from a partial or "short" cost reporting period.  See, e.g., ParkView Medical Associates, L.P. v. Shalala, 158 F.3d 146, 147-49 (D.C. Cir. 1998) (noting that "the hospital filed one report on its wages for the last four months under the prior ownership . . . , and another for the first eight months of the new ownership," but that it did not file a "single [cost] report for the full twelve-month period"); id. at 148-49 & n. 3 (repeatedly using the term "short-period reports" and "short periods" to describe the 8 and 4 month cost reports.)

In this case, Congress specified use of full, that is, 12 month, cost reporting periods in drawing the line as to which providers would qualify for the CIB.  The Secretary implemented this policy choice.  As the courts have noted, "drawing lines is the business of Congress and inevitably individuals on the wrong side of the division do not fare well" and "[t]he result is unfortunate for those adversely affected, but arbitrariness is often unavoidable."  See Torres v. Chater, 125 F.3d 166, 171 (3rd Cir. 1997).

Finally, the Plaintiff's reading of the statutory and regulatory language governing eligibility for a CIB should be rejected because it would lead to absurd results that surely were not intended by Congress or the Secretary.  This is true for at least two reasons.  First, Plaintiff's interpretation it would allow a hospital with 3 cost reporting periods each covering as little as one month to satisfy the "at least 3 full cost reporting periods" requirement, leaving the Secretary and his Intermediary in a position where they could not judge whether the hospital's operating costs were stabilized and representative, an absurd result that surely runs counter to Congress' intent. See Pl.'s Op. Brf. at 4 (Plaintiff's opening brief, acknowledging that the purpose of the CIB was to reward hospitals whose true costs per discharge were under certain limits); AR 200-02

(Intermediary position paper, noting that "[o]ne of the reasons the Secretary required three [prior] full cost reporting periods was to ensure [that] the operating costs of a new provider were stabilized," and explaining that per discharge amounts for the cost reporting periods at issue in this case can be "volatile" and "can vary significantly from month to month," that "[a] full twelve-month cost reporting period does not have this issue as it washes over the full year," and that "[a] trended cost amount calculated from a short period cost report might not be representative of the provider's operating costs"); see also AR 140 (transcript pages 72, argument of Intermediary's representative at PRRB hearing that the "Provider should not be allowed to use a short period cost report to determine their trended costs as it may not be representative of their operating costs"), 141 (transcript pages 73) (reiterating that "short-cost reporting periods, which could range from 1 to 11 months, may not be representative of a Provider's operating costs"), 142 (transcript pages 77-80, description with specific numerical examples of how the "costs per discharge can come down," depending on the length and timing of the cost reports considered).

Second, as the Intermediary's representative noted during the PRRB hearing, it "would not be just or accurate [or equitable] to allow some Providers to use a short period cost report, which could be one month, to determine their trended cost amount, when others are using a 12-month cost reporting period." See AR 141 (transcript pages 74-75, explaining that "if short period cost reporting periods are considered full, it would produce an inequity" inasmuch as "[i]n this situation, [Select Specialty]'s three cost reporting periods would total only 29 months" while "other providers would be required to provide cost reports representing 36 months.")

Because Plaintiff's interpretation would lead to absurd results that surely were not intended by Congress or the Secretary, it is not reasonable and certainly is not compelled. See

United States v. Turkette, 452 U.S. 576, 580, 101 S. Ct. 2524, 2527 (1981) (noting that, in

interpreting statutes, "absurd results are to be avoided");  Secretary of Labor v. Twentymile Coal

Co., 411 F.3d 256, 260 (D.C. Cir. 2005) (rejecting a challenge to an agency regulation in part

because"[t]o read the regulation's use of the term 'occur' in a way that precludes coverage of

events that have not previously occurred yet promise to occur with regularity in the future would

lead to absurd results"); Thomas Jefferson Univ., 512 U.S. at 512.  In contrast, the Secretary's

interpretation is consistent with the plain language of the statute, congressional intent, and past

administrative practice.  It easily passes muster under the deferential APA standard of review.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court deny

Plaintiffs' motion for summary judgment and grant the Secretary's motion for summary

judgment.

Respectfully submitted,

_____/ s /_____
JEFFREY A. TAYLOR, D.C. Bar No. 498610
United States Attorney

_____/ s /_____
MEGAN L. ROSE, N.C. Bar No. 28639
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7220/FAX: (202) 514-8780

_____/ s /_____
JONATHAN C. BRUMER, D.C. Bar No. 463328
U.S. Department of Health and Human Services
Office of the General Counsel, CMS Division
330 Independence Ave., S.W.
Cohen Building, Room 5344
Washington, D.C. 20201
(202) 205-8703/FAX: (202) 401-1405