# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SELECT SPECIALTY HOSPITAL-<br>HOUSTON HEIGHTS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:05CV01791 (RBW) |
| MICHAEL O. LEAVITT,<br>Secretary of Health and Human Services, | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff, Select Specialty Hospital Houston Heights ("Select Specialty"), a long term care hospital ("LTCH") which participates in the Medicare program, is before this Court challenging a final decision of the Defendant Michael O. Leavitt, Secretary of Health and Human Services ("Defendant" or "the Secretary").  In this decision, the Secretary determined that because Select Specialty filed its Medicare cost report without in any way claiming entitlement to a continuous improvement bonus ("CIB"), it could not meet the statutory and regulatory requirement of being "dissatisfied" with a fiscal intermediary determination, which is a jurisdictional precondition to Provider Reimbursement Review Board ("PRRB") jurisdiction.  Second, the Secretary concluded that, even if the PRRB had jurisdiction to hear Select Specialty's case, Select Specialty did not qualify for a CIB because it did not operate as a LTCH for "at least 3 <u>full</u> cost reporting periods" prior to the cost period for which it sought a CIB, as the statute and regulations require.  The parties have filed cross-motions for summary judgment and oppositions thereto.

The Secretary has reasonably determined both that a provider which omits a cost claim from its cost report solely through its own inadvertence is not "dissatisfied" and that a "full cost" reporting period is a 12 month cost reporting period for CIB eligibility purposes.  These determinations are entitled to substantial deference as they are the product of reasonable interpretations of ambiguous statutory and regulatory provisions and the exercise of agency expertise in the context of a complex and highly technical regulatory program.  See Memorandum of Points and Authorities in Support of Defendant's Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp.") at 12-16 (setting forth the deferential standard of review that is appropriate in this case).

Plaintiff contends that the statutory interpretation underlying "Defendant's final [jurisdictional] determination . . . is not entitled to substantial deference under the standards enunciated in Chevron U.S.A. Inc. v.Natural Res. Def. Council, 467 U.S. 837, 842 (1984) [Chevron]" because "[t]he Supreme Court, the Court of Appeals for the District of Columbia Circuit, and other federal courts have specifically held 42 U.S.C. § 1395oo(a) to be clear and unambiguous."  See Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross Motion for Summary Judgment ("Pl.'s Opp.") at 2-3.  For the reasons set forth below and in the Secretary's opening brief, Plaintiff is mistaken and its claim rests on a fundamental misreading of Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 403 (1988) ("Bethesda"), Washington Hosp. Ctr. v. Bowen, 795 F. 2d 139, 144 (D.C. Cir. 1986), MaineGeneral Med. Ctr. v. Shalala, 205 F. 3d 493, 501 (1st Cir. 2000) (MaineGeneral"), and Chevron, 467 U.S. at 842, among other cases.  See Pl.'s Opp. at 3-5.  Although Plaintiff argues that the Secretary is inviting the Court to "ignore" or "disregard" these precedents, see Pl.'s Opp.

At 3-4, it is in fact Plaintiff who has done so.  Plaintiff also fails in its attempts to distinguish the

three seminal decisions the Secretary cited in its opening brief, which establish that the

Secretary's regulatory interpretations are owed deference and that contrary decisions by the

PRRB do not lessen the deference owed to final decisions of the Secretary.[1]

## I.    THE SECRETARY REASONABLY CONCLUDED THAT THE PRRB LACKED JURISDICTION BECAUSE SELECT SPECIALTY FAILED TO SATISFY THE STATUTORY "DISSATISFACTION" REQUIREMENT

### A.    Bethesda did not Preclude the Secretary's Interpretation of Section 1395oo(a), and Indeed Signaled that such an Interpretation was Plausible

Plaintiff claims that "Bethesda clearly holds that [any] provider may 'claim

dissatisfaction, within the meaning of the statute without incorporating their challenge in the cost

reports filed with their fiscal intermediaries.'"  See Pl.'s Opp. at 6 (citing Bethesda, 485 U.S. at

405); see also id. at 8 (asserting that "Bethesda established a broad rule that providers need not

---

[1]  Specifically, Plaintiff argues that Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994), S.G. Loewendick & Sons, Inc. v. Reich, 70 F.3d 1291 (D.C. Cir. 1995), and Homan & Crimen, Inc. v. Harris, 626 F.2d 1201 (5th Cir. 1980) are distinguishable and inapposite because these decisions "involv[ed] statutes and regulations not at issue in this appeal."  See Pl.'s Opp. At 3 & n. 1; Def.'s Opp. At 14.  In fact, the propositions for which the Secretary cited these decisions are well established, longstanding, generally applicable principles of administrative law which have been applied and reiterated on numerous occasions by the Supreme Court and other courts in variety of administrative law contexts involving a wide array of provisions and contexts.  See, e.g., Thomas Jefferson, 512 U.S. at 512 (declaring generically that "[w]e must give substantial deference to an agency's interpretation of its own regulations," that "the agency's interpretation must be given controlling weight unless it is plainly erroneous . . . ," and that "[t]his broad deference is all the more warranted when . . . the regulation concerns 'a complex and highly technical regulatory program'"); Loewendick, 70 F. 3d at 1294 (same); Homan, 626 F. 2d at 1205 (explaining, without qualification, that "[t]he decision of the PRRB carries no more weight on review by the Secretary than any other interim decision made along the way in an agency where the ultimate decision of the agency is controlling"); see also Cmty. Care Found. v. Thompson, 318 F.3d 219, 227 (D.C. Cir. 2003) (observing that "[t]here is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level.")

incorporat[e] their challenges in the cost reports . . . in order to qualify under section 1395oo(a)"). The <u>Bethesda</u> decision does not stand for this broad proposition. Rather, the <u>Bethesda</u> court properly limited itself to a consideration of the specific narrow legal issue and factual circumstances there presented (all of which are distinguishable from those present in this case). <u>See</u> Def.'s Opp. at 19-22. Accordingly, in the sentence Plaintiff incompletely quotes, the Court merely held that the "petitioners"(as opposed to all "providers" as Plaintiff would have it) could claim dissatisfaction under the unique circumstances presented in that case. <u>See</u> <u>Bethesda</u>, 485 U.S. at 405; Pl.'s Opp. at 6, 8.[2]

The <u>Bethesda</u> Court defined the precise legal issue it was resolving at the outset of its opinion, announcing that "[t]his case requires us to decide whether the Board may decline to consider a provider's [facial] challenge to <u>one of the Secretary's regulations</u> on the ground that the provider failed to contest the <u>regulation's validity</u> in the cost report submitted to its fiscal intermediary." <u>See</u> <u>Bethesda</u>, 485 U.S. at 400; Def.'s Opp. at 19. The <u>Bethesda</u> Court repeatedly noted that the rule the provider had sought to challenge was binding on the intermediary, non-discretionary, and clearly precluded reimbursement for the costs at issue. <u>See</u> <u>Bethesda</u>, 485 U.S. at 401-02, 404-05; Def.'s Opp. at 19-22. By contrast, the legal issue presented here is whether,

───────────────

[2] It was appropriate for the <u>Bethesda</u> Court to limit its inquiry in this manner. The <u>Chevron</u> doctrine directs courts to evaluate the ambiguity of a statutory provision and the reasonableness of its interpretation, not in a vacuum or in the abstract, but instead relative to the particular legal issue and factual context presented. <u>See</u>, <u>e.g.</u>, <u>Chevron</u>, 467 U.S. at 842-43 (holding that "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions . . . whether Congress has directly spoken to the <u>precise</u> question at issue" and noting that "if the statute is silent or ambiguous with respect to the <u>specific</u> issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute") (emphasis added). Thus, courts may find a statutory provision to be unambiguous as to one legal issue, but silent or ambiguous as to another. <u>Id.</u>

where no regulation or binding policy precludes a provider from claiming a payment, the provider must in some way ask its intermediary for that payment before seeking it from the PRRB in the first instance.  See Def.'s Opp. at 21.  Nor does this case involve a facial challenge to a regulation.  Simply put, this is a case in which the provider's claim for payment was "within the intermediary's competence," see Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala, 165 F.3d 1162, 1165 (7th Cir. 1999), and thus was required to have been presented to the intermediary unlike the claim at issue in Bethesda.

The specific interpretation by the Secretary which the Bethesda court found to be "strained" and contrary to the plain meaning of the statute was one that required providers to "submit a claim for cost reimbursement in a manner prohibited by the regulations" prior to their "presenting the matter to the Board."  See Bethesda, 485 U.S. at 404 (noting petitioner's objection on that score) (emphasis added).  No such interpretation is urged by the Secretary here. While the Bethesda court held that the usual practice of requiring presentation of claimed costs to the intermediary before their presentation to the Board was not required in those specific circumstances, such circumstances are absent here.

Bethesda's central holding rested on considerations relevant only in the context of a non-discretionary, unambiguous regulation or policy which precluded reimbursement, including a recognition that it would be futile for a provider to claim a cost precluded by such a rule, or to present a facial challenge to the regulation to the Intermediary, since the Intermediary was legally bound by the regulation.  As the Bethesda court noted, the question of futility has direct bearing on what actions a provider may reasonably be required to take to satisfy the "dissatisfaction"

- 5 -

requirement.[3] Thus, this Court may easily dispense with Plaintiff's assertions that <u>Bethesda</u> did

not consider this question of futility and that a "futility" requirement represents "an additional

jurisdictional requirement" which is unsupported by the statute.  <u>See</u> Pl.'s Opp. at 7-8.  In this

case, no regulation prohibited Plaintiff from claiming a CIB in its cost report.  Nor did any rule

prevent the Intermediary from exercising its discretion and awarding the Plaintiff a CIB.  <u>See</u>

Def.'s Opp. at 17, 21-22.  Thus, Plaintiff cannot reasonably claim that it would have been futile,

in the <u>Bethesda</u> sense, for it to include a claim for a CIB in its cost report.  <u>Id</u>.

　　　As the Secretary has noted, two sentences in <u>Bethesda</u> make clear that the decision was

not intended to resolve the question of whether "providers who bypass a clearly prescribed

exhaustion requirement or who fail to request from the intermediary reimbursement for all costs

to which they are entitled under applicable rules" satisfy the "dissatisfaction" requirement of 42

U.S.C. § 1395oo(a).  <u>See Bethesda</u>, 485 U.S. at 404-05 (explaining that such providers "stand on

a different ground" because "such defaults might well establish that a provider was satisfied with

---

　　　[3] <u>See</u>, <u>e.g.</u>, <u>Bethesda</u>, 485 U.S. at 404 (reasoning that"[n]o statute or regulation expressly
mandates that a challenge to the validity of a regulation be submitted first to the fiscal
intermediary" and that "[p]roviders know that, under the statutory scheme, the fiscal intermediary
is confined to the mere application of the Secretary's regulations" and "is without power to
award reimbursement except as the regulations provide, and that any attempt to persuade the
intermediary to do otherwise would be futile"); id. at 406 (noting that "[n]either the fiscal
intermediary nor the Board has the authority to declare regulations invalid"); id. at 407 (noting
that "[t]he statute provides . . . that the intermediary has no authority to deviate from the rules
and regulations and that the Board, not the fiscal intermediary, is to make the determination that
it lacks the requisite authority to consider the validity of the regulation" and that "requiring
submission of the regulatory challenge to the fiscal intermediary is quite unnecessary"); <u>id</u>. at 408
(reasoning that "[t]he Secretary cannot maintain on the one hand, that it is of vital importance to
present challenges to the Secretary's regulations in the first instance to the fiscal intermediary
and on the other . . . [assert] that the fiscal intermediary lacks authority to rule on the
challenge."); <u>see also</u> <u>id</u>. at 408 (concluding that "[b]y objecting to the regulation in the first
instance in proceedings before the Board, the petitioners protected their right to judicial review").

the amounts requested in its cost report and awarded by the fiscal intermediary"); Def.'s Opp. at 20-22. Yet Plaintiff claims that the Secretary has placed "unwarranted emphasis" on this language in the <u>Bethesda</u> opinion, implies that it should not be given any "weight" because it is dicta, and denies that it "inject[ed] ambiguity in the statute." <u>See</u> Pl.'s Reply at 3-4.

Courts have recognized that even dicta in a Supreme Court decision is entitled to great weight and should be considered in determining the intended scope and meaning of the decision.[4] Moreover, the Supreme Court has also recognized that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to <u>Chevron</u> deference <u>only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion</u>" and that "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." <u>See</u> <u>National Cable & Telecommunications Ass'n v. Brand X Internet Services</u>, 125 S.Ct. 2688, 2700 (2005) ("<u>National Cable</u>").

The <u>Bethesda</u> decision left unresolved whether providers "who bypass[ed] a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules" satisfy the dissatisfaction requirement, and appeared to leave the door open to an interpretation by the Secretary that they

---

[4] <u>See</u>, <u>e.g.</u>, <u>United States v. Oakar</u>, 111 F.3d 146, 153 (D.C. Cir.1997) ("carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative"); <u>Washington State Republican Party v. Washington</u>, 460 F.3d 1108, 1117, n. 13 (9th Cir. 2006) (noting that "Supreme Court dicta is generally entitled to 'great weight' and 'appropriate deference.'") (internal citations omitted); <u>Schwab v. Crosby</u>, 451 F.3d 1308, 1325-26 (11th Cir. 2006) (collecting decisions recognizing that Supreme Court dicta is entitled to considerable deference and weight.)

did not.  Accordingly, the Bethesda decision left "room for agency discretion" and a "gap for the agency to fill" in those particular contexts, making Chevron deference proper in those situations. See Bethesda, 485 U.S. at 404-05; Def.'s Opp. at 20-22; National Cable, 125 S.Ct. at 2700.

Plaintiff additionally argues that the "circumstances . . . not presented" in Bethesda are not present in this case because the PRRB initially accepted jurisdiction and because the intermediary populated part of the CIB portion of Plaintiff's cost report.  See Pl.'s Opp. at 4-5. This effort is unavailing.  Neither logic nor anything in the Bethesda opinion suggest that the fact that the PRRB erroneously accepted jurisdiction over Plaintiff's administrative appeal before being reversed by the Secretary, nor the fact that the Intermediary unnecessarily filled in part of the CIB portion of Plaintiff's cost report, alter the reality that Plaintiff "fail[ed]" in any way "to request from the intermediary reimbursement for all costs to which they" might have been "entitled under applicable rules."  See Bethesda, 485 U.S. at 404-05.  Whereas in Bethesda the providers were challenging a regulation of the Secretary in the only manner they could, through a self disallowance (that is, by entering costs on a worksheet in the cost report without requesting reimbursement for them from the intermediary), here Plaintiff simply did not seek reimbursement.  Thus, this case presents a situation "not presented" in Bethesda.

## B.      D.C. Circuit Precedent is Entirely Consistent with the Secretary's Position

In its latest filing, Plaintiff persists in arguing that Washington Hospital Center v. Bowen, 795 F. 2d 139, 144 (D.C. Cir. 1986) ("Washington") supports its position.  See Pl.'s Opp. at 9. However, as the Secretary noted in his opening brief, this decision is readily distinguishable because it concerned different provisions within 42 U.S.C. § 1395oo that relate to PRRB appeals arising in the Prospective Payment System ("PPS") context, have a completely different

legislative history from the jurisdictional provision at issue in this case, and implicate different policy considerations. See Def.'s Op. at 24-25. Throughout the Washington opinion, the D.C. Circuit was careful to limit its holding to the specific context of PPS appeals. In an attempt to suggest otherwise, Plaintiff quotes from excerpts of two sentences which appear in the opinion but, in each case, omits crucial qualifying language which provides the necessary context.[5]

First, the distinction between PPS PRRB appeals and reasonable cost PRRB appeals was clearly central to the D.C. Circuit's reasoning in Washington. See, e.g., Washington, 795 F. 3d at 146 (observing that "[u]nder the cost reimbursement system, . . . final payments cannot be made until a cost report has been filed and verified," whereas "[u]nder PPS, in contrast, payment amounts are independent of current costs and can be determined with finality prior to the beginning of the cost year" and "[t]hus a year-end cost report is not a report which is necessary in order for the Secretary to make PPS payments, and the appeals provision applicable to PPS recipients cannot be read to require hospitals to file cost reports and await NPRs prior to filing a PRRB appeal."); id. at 149 (noting that "Congress' primary purpose in switching from cost reimbursement to prospective payment was to provide hospitals with 'predictability regarding payment amounts'" and that [b]ecause the key to the PPS system is the hospital's advance knowledge of the amount of payment it will receive, payment rates must be determined with finality prior to the beginning of the hospital's cost year.").

---

[5] See Pl.'s Opp. at 9; Washington, 795 F. 2d at 144 (noting that "the plain language added to section 1395oo (a) as part of the prospective payment system enacted by Congress in 1983 establishes that a determination such as the one made by the intermediary here is reviewable by the [PRRB] before an NPR is issued") (emphasis added); id. at 149 (holding that "[t]he statute provides for PRRB review once there has been a final determination of the amount of payment under PPS, which during the transition period requires only a final determination of a hospital's target amount") (emphasis added).

In any event, Washington was decided two years before Bethesda. Therefore, to the extent that Washington can be read to suggest that section 1395oo(a) is unambiguous on the issue of whether section 1395oo(a)'s "dissatisfaction" requirement is satisfied by "providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules," it was clearly reversed by the subsequently decided Bethesda decision. See Def.'s Opp. at 25.

Plaintiff makes much of the D.C. Circuit's acknowledgment in HCA Health Servs. of Okl. v. Shalala, 27 F.3d 614, 621, n. 4 (D.C. Cir. 1994) that Bethesda "may have undercut the validity of the holdings in St. Mary and Athens which limited Board appeals from an NPR to cost items originally presented to the intermediary," see Pl.'s Opp. at 9-10, but this language does not help Plaintiff nearly as much as it imagines. Bethesda undercut the validity of St. Mary and the Athens decisions only to the extent that Bethesda clarified that these two holdings could not be applied to a situation where a provider wished to bring a facial challenge to a regulation which was binding on the intermediary and clearly precluded reimbursement for the costs at issue, rendering any attempt to present the challenge to the intermediary futile.

Nevertheless, Athens and St. Mary otherwise remain binding law in this Circuit, particularly as applied to "providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules," as this Court recently appeared to recognize. See Abbott-Northwestern Hosp. v. Leavitt, 377 F.Supp.2d 119, 131 (D.D.C. 2005) (citing Athens for the proposition that the "PRRB lacks jurisdiction over issues unless they were considered by the intermediary in the underlying determination" and that "PRRB jurisdiction" is limited "to those issues raised in the

hospital's cost report that informed the intermediary's final determination," and referring to the "jurisdiction preclusion holding of <u>Athens</u>.")  <u>Athens</u> is easy to reconcile with <u>Bethesda</u>.  <u>Athens</u>, after all, went out of its way to emphasize that the provider there had been free to claim the cost at issue, but nevertheless had failed to do so solely because of its inadvertence, consistent with the <u>Bethesda</u> decision's dicta and emphasis on the futility consideration.[6]

## C.    This Court Should Reject the First Circuit's Flawed <u>St. Luke's</u> and <u>MaineGeneral</u> Opinions.

Plaintiff cites the First Circuit's majority opinion in <u>MaineGeneral</u>, which of course is not binding on this Court, as authority for the principle that "the Board has the power under subsection 1395oo(a) to decide provider reimbursement issues <u>as a matter of discretion</u>" and Plaintiff "urges this Court to follow the principles enunciated in <u>MaineGeneral</u>."  <u>See</u> Pl.'s Opp. at 10-11 (emphasis added).[7]  This Court should not follow <u>MaineGeneral</u> for all of the reasons set forth in the Secretary's opening brief, <u>see</u> Def.'s Opp. at 28-31, and for the additional reasons

---

[6]  <u>See</u> <u>Athens</u>, 743 F. 2d at 10 & n. 17 (noting that "[t]he reason [the provider] HCA failed to request reimbursement for these costs, HCA admits, was its own inadvertence," it "did not inform the intermediary that it believed that it was entitled to be reimbursed for these costs until long after the NPR had been issued," that "[a]s such, the PRRB was correct in holding that it did not have jurisdiction to consider these costs because the intermediary was never given the opportunity to make a final determination about them," and thus that "[a]ny dissatisfaction on the part of HCA must be with its own failure to claim these costs in a timely fashion.")

[7]  Plaintiff's embrace of <u>MaineGeneral</u>'s finding that the PRRB has <u>discretionary</u> power to hear appeals in cases where providers inadvertently fail to claim costs is in considerable tension with Plaintiff's claims elsewhere in its briefs that <u>Bethesda</u> and 1395oo(a) give providers a <u>right</u> to a PRRB hearing in those circumstances.  <u>See</u>, <u>e.g.</u>, Pl.'s Opp. at 6 (claiming that "Plaintiff, by statute, was entitled to a hearing before the PRRB"), 7 (asserting that "the unambiguous dictates of subsection 1395oo(a) provide that a provider dissatisfied with the final determination . . . is entitled to a hearing before the Board"); Plaintiff's Houston Heights' Memorandum in Support of its Motion for Summary Judgment ("Pl.'s Opening Brf.") at 13 (claiming that "even if the Intermediary had not adjusted the expected cost line," Plaintiff "would still have a right . . . to appeal the Intermediary's decision not to grant the CIB.")

stated below.

MaineGeneral is inconsistent with Chevron, Bethesda, and National Cable inasmuch as it refused to accord Chevron deference to the Secretary's determination that the provider there had failed to satisfy the "dissatisfaction" requirement in a precise circumstance where the Bethesda court had indicated reasonable minds could disagree. After all, in MaineGeneral, the PRRB had found that it lacked jurisdiction over the provider's appeal because the provider, "although eligible to receive Medicare reimbursement for certain expenses," had mistakenly fail[ed] to ask for that reimbursement in a timely manner," the precise situation which the Bethesda court had acknowledged "might well establish that a provider was satisfied with the amounts requested in its cost report and awarded by the fiscal intermediary," rendering an interpretation to that effect plausible and reasonable for Chevron purposes. See MaineGeneral, 205 F. 3d at 494; Bethesda, 485 U.S. at 404-05; Chevron, 467 U.S. at 842-43; National Cable, 125 S.Ct. at 2700. Inasmuch as MaineGeneral gave the Bethesda dicta concerning this circumstance short shrift, it also acted contrary to D.C. and First Circuit precedent concerning the deference and weight owed to Supreme Court dicta. See MaineGeneral, 205 F. 3d at 499; Oakar, 111 F.3d at 153; S.E.C. v. Rocklage, 470 F.3d 1, *7, n. 3 (1st Cir. 2006); United States v. Santana, 6 F.3d 1, 9 (1st Cir.1993); McCoy v. MIT, 950 F.2d 13, 19 (1st Cir. 1991) ("federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . .· a dictum is of recent vintage and not enfeebled by any subsequent statement"); supra at 7, n. 4.

This Court should also decline to follow MaineGeneral because it relied upon St. Luke's Hosp. v. Secretary of HHS, 810 F. 2d 325 (1ˢᵗ Cir. 1987), which in turn improperly deferred to

statutory interpretations and jurisdictional decisions that had been made by the PRRB but not

endorsed by the Secretary, in a manner inconsistent with binding precedent in the D.C. Circuit.

Compare St. Luke's Hosp., 810 F. 2d at 330 (declaring that "[w]e have found several instances in

which the Board has decided questions not raised before the intermediary" and concluding that

"[e]ven if these [PRRB] decisions were never explicitly endorsed by the Secretary, the Board's

own interpretations, which the Secretary declined to reverse, are entitled to some weight.") with

Cmty. Care Found., 318 F.3d at 227 (observing that "[t]here is no authority for the proposition

that a lower component of a government agency may bind the decision making of the highest

level").

>    **D.    The Seventh Circuit's holdings in the Little Co. cases, Battle Creek, and
>            Public Policy All Support the Secretary's Jurisdictional Position Here.**

In its latest brief, Plaintiff attempts to distinguish Little Co. of Mary Hosp. & Health Care

Ctrs. v. Shalala, 24 F.3d 984 (7th Cir. 1994) ("Little Co. I") on the basis that the hospital there

was "subject to hospital PPS, not cost-based reimbursement" like the Plaintiff, and on the ground

that the decision included a discussion of a PPS regulation, 42 C.F.R. § 412.60(d), which gave

hospitals 60 days to correct erroneous diagnosis related group assignments ("DRG").  See Pl.'s

Opp. at 13-14.  The Secretary addressed this argument in his opening brief, acknowledging that a

portion of the Little Co. I decision was devoted to this rule and exhaustion requirement, but

explaining that in another freestanding portion of the decision the Seventh Circuit observed that

the Bethesda decision – which arose in the reasonable cost context –  contains language that

"strongly suggests a hospital that does not ask its intermediary to reimburse it for all of the costs

- 13 -

for which it is entitled to be reimbursed cannot, on appeal to the Board, first ask for new costs."
See Little Co. I, 24 F.3d at 993; Def.'s Opp. at 25-26.

Plaintiff mischaracterizes the rationale of Little Co. I, vastly overstating the role the 60 day DRG exhaustion rule played in its analysis, and understating the role Bethesda played in its reasoning. See Pl.'s Opp. at 13-14. Plaintiff asserts that the court "recognized that '[t]he Board is bound by the 60-day rule, and would not have the 'authority' to allow the provider to circumvent its application . . .'" when in fact Little Co. I used this language solely to describe the Secretary's litigation position, a position the Little Co. I court made clear it rejected. See Pl.'s Opp. at 13-14; Little Co. I, 24 F. 3d at 992 (noting that this was what the Secretary "contends," his "view," and "insists" upon in court, but that "[t]his would represent a different rationale than invoked by the Board, which denied 'jurisdiction'"). The Little Co. I court cited but pointedly did not apply the language in Bethesda referring to "providers who bypass a clearly prescribed exhaustion requirement." Id. at 993. Instead, Little Co. I explicitly stated that it was "picking up" on the language in Bethesda suggesting that a "hospital that does not ask its intermediary to reimburse it for all of the costs for which it is entitled . . . cannot, on appeal to the Board, first ask for new costs," and that it was the provider's "fail[ure] to appeal its original PPS payment," more than its failure to comply with the 60 day exhaustion requirement, which "surely" had "estop[ped] Little Company from now claiming to be dissatisfied." Id. at 993 (noting that "Little Company is precisely the 'provider[] who . . . fail[s] to request from the intermediary reimbursement for all costs to which [it is] entitled under applicable rules' to which the Bethesda Hospital Court was referring.") Plaintiff's suggestion that the language in Little Co. I respecting the dissatisfaction requirement was only intended to apply in the PPS context, is undercut by the

fact that the court stated that it was the Medicare "statute's first dissatisfaction requirement," found at 42 U.S.C. § 1395oo(a)(1)(A)(i), the very statutory provision involved here, which was "at issue," not the dissatisfaction requirement which relates to appeals from PPS payment.  See Little Co. I, 24 F. 3d at 993, n. 8.  Finally, as noted above, the fact that the Board accepted jurisdiction at the outset in this case, but not in Little Co. I, is not a basis for distinguishing that case since it is the Secretary's final decision (which reversed the PRRB's decision on jurisdiction) which is under review in this case, and not the PRRB's earlier ruling.

        Plaintiff attempts to distinguish Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala, 165 F.3d 1162 (7th Cir. 1999) ("Little Co. II") and Battle Creek v. Leavitt, 5:05CV0053 (E.D. Mich. Oct. 26, 2006) ("Battle Creek") on the basis that the providers in those cases, unlike this one, sought to "raise new positions in the appeals that had been granted on other cases."  See Pl.'s Opp. at 15.  This effort fails as these two rulings did not turn on this incidental factual detail.  Nor is Plaintiff correct to argue that Little Co. II simply recognized a discretionary power on the part of the PRRB to refuse to hear claims that had not been presented to the intermediary, or to hear such claims, as it wished.  See Pl.'s Opp. at 15.

        The Little Co. II court used absolute, not permissive, language.  It noted that, under 42 U.S.C. § 1395oo(a)(1)(A)(i), "[t]he Board is allowed to review a ruling by a fiscal intermediary only if the provider (the hospital in this case) is dissatisfied with a final determination of the . . . fiscal intermediary . . .,".and that "the intent [of 42 U.S.C. § 1395oo(a)(1)(A)(i)] is plain that the provider must give the intermediary a first shot at the issue, provided the issue is within the intermediary's competence," a holding that was emphatic and in no way was dependent on or restricted to the circumstance where a provider changed its position during its PRRB appeal.  See

<u>Little Co. II</u>, 165 F. 3d at 1165 (emphasis added). The fact that <u>Little Co. II</u> had in mind an absolute jurisdictional requirement, applicable whether or not a provider changed its position, is confirmed by the fact that it cited to two cases which did not involve that factual circumstance, <u>Bethesda</u> and <u>Little Co. I</u>, as authority for the notion that the hospital was required to give the intermediary a "first shot at the issue, provided the issue is within the intermediary's competence." <u>Id</u>. at 1165 (emphasis added).

Similarly, Plaintiff's effort to distinguish <u>Battle Creek</u> based on its facts is unavailing. The court there announced that it found "the post- <u>Bethesda</u> interpretation of the statute by the Seventh Circuit in the <u>Little Co.</u> cases and the dissent in the First Circuit's <u>MaineGeneral</u> decision persuasive," without qualifying its endorsement in any way. <u>See</u> <u>Battle Creek</u>, 2006 WL 3055959, *6 (W.D. Mich. 2006). It held that the "provider may not claim dissatisfaction based on the omitted or mischaracterized cost that the intermediary did not consider when making its final determination" and "can only claim dissatisfaction on matters which the intermediary had a 'first shot' at considering," a conclusion that in no way was conditioned on the fact that the issue had been added to a PRRB appeal. <u>Id</u>.

Finally, Plaintiff has not responded to any of the myriad of policy-based arguments which the Secretary has advanced in favor of his jurisdictional interpretation and policy. <u>See</u> Def.'s Opp. at 31-35; <u>see also</u> <u>Athens</u>, 743 F. 2d at 6-8 (detailing these and other "significant adverse practical consequences" associated with a contrary interpretation).

**II.    The Secretary Reasonably Concluded that Select Specialty Did not Qualify For a CIB Because it Did not File Three "Full" 12 Month Cost Reports as a LTCH Prior to the Cost Year in Which it has Sought a CIB**

Plaintiff alleges that "[m]any of the provisions cited by the Defendant in support of his argument" that Congress and the Secretary have consistently understood the term "full cost reporting period" to connote a 12 month cost reporting period "have no relation to the CIB statute and regulation and, therefore, offer no insight whatever into Congressional intent with respect to cost containment incentives, including the CIB." See Pl.'s Opp. at 17.  First, as a matter of law, Plaintiff is mistaken that other provisions of the Balanced Budget Act and Medicare statute have no bearing on Congress' understanding of what the term "full" signified. See  See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S.Ct. 1503, 1513 (2006) ("[g]enerally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning.'"); IBP, Inc. v. Alvarez, 546 U.S. 21, 126 S.Ct. 514, 523 (2005) (same).

In any event, the Secretary's opening brief cited to a long list of statutory provisions which establish that Congress has defined the CIB eligibility criteria using formulas expressed in terms of "12 month" cost reporting periods and "fiscal year[s]," as is set forth in more detail below.  See Def.'s Opp. at 38, n. 5.  The Secretary also cited to a long list of regulatory citations which define the terms "target amount," "trended costs," and "expected costs," for purposes of the CIB, using language which is replete with references to "12 month" and "full" cost reporting periods, and which draws an explicit distinction between such full 12 month cost reporting periods and shorter cost reporting periods and expresses greater confidence in the accuracy and representative nature of full cost reporting periods than short ones.  See Def.'s Opp. at 38-39 & n. 6.  This evidence, along with the other evidence the Secretary identified in its opening brief that

Congress and the Secretary have long understood the phrase "full cost reporting period" to refer to a 12 month cost reporting period, see Def.'s Opp. at 38-45 & n. 5 & n. 6 & n. 7 & n. 8, certainly allows the Secretary's statutory and regulatory interpretation to survive review under the very deferential standards of review which apply to such agency interpretations, and indeed suggests that the Secretary's interpretation is more natural than the one offered by Plaintiff. See, e.g., National Cable, 545 U.S. at 2699 (noting that "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation"); Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 103 (1995) (noting that "[w]e must give substantial deference to an agency's interpretation of its own regulations" unless the interpretation is "'plainly erroneous or inconsistent with the regulation.'") While Plaintiff is correct that the term "'full cost reporting period' is not [formally] defined by the CIB statute or regulations," see Pl.'s Opp. at 17, this does not mean that the Secretary's interpretation is unreasonable, but rather just that the term is vague, triggering deferential review of the Secretary's interpretations under Chevron and Thomas Jefferson.

Plaintiff argues that it "deserves" a CIB because it succeeded in keeping "its costs below statutory targets for 41 months prior to the fiscal year at issue" and that "this result is untenable" and "inconsistent with Congressional intent." See Pl.'s Opp. at 18 (emphasis in original). From all that appears though, Plaintiff is wrong about Congressional intent, and Congress may not have shared its understanding of what it "deserves." As has been noted, Congress required that the hospital seeking a CIB demonstrate that its "operating costs for the period are less than the

least of" certain benchmarks: "its target amount, its trended costs . . . , or its expected costs . . .

for the period."  See 42 U.S.C. § 1395ww(b)(2)(B)(ii).

The definitions which Congress gave each of the foregoing terms provides compelling

evidence that by "full" cost reporting periods it had in mind 12 month cost reporting periods.

Congress defined the term "target amount" using a formula which involved, among other things,

a consideration of the "allowable operating costs of inpatient hospital services" during the

preceding "12 month" cost reporting period.[8]  Similarly, Congress defined "trended costs" in

terms of a formula which involved a consideration of operating costs and target amounts during

particular "fiscal" years, "full" cost reporting periods, and increases in market basket percentage

increases in subsequent "fiscal years."[9]  Finally, Congress defined the term "expected costs" by

reference to a formula which involved a consideration of operating costs of inpatient hospital

services, target amounts, and the "market basket percentage increase" in particular "fiscal

---

[8]  Congress specified that the term "target amount" means, "with respect to a hospital for a particular 12-month cost reporting period– (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services . . . recognized under this title for such hospital for the preceding 12-month cost reporting period, and (ii) in the case of a later reporting period, the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase . . . for that particular cost reporting period."  See 42 U.S.C. § 1395ww(b)(3)(A) (emphasis added); see also 42 U.S.C. §§ 1395ww(a)(4) (defining the term "operating costs of inpatient hospital services), 1395ww(b)(3)(B) (setting forth the "applicable percentage increase").

[9]  See 42 U.S.C. § 1395ww(b)(2)(C) (explaining that "trended costs" are, "in the case of a hospital for which its cost reporting period ending in fiscal year 1996 was its third or subsequent full cost reporting period for which it receives payments under this subsection [i.e., as a PPS exempt provider], the lesser of the operating costs or target amount for that hospital for its cost reporting period ending in fiscal year 1996," but that, "in the case of any other hospital," trended costs are "the operating costs for that hospital for its third full cost reporting period for which it receives payments under this subsection, increased (in a compounded manner) for each succeeding fiscal year (through the fiscal year involved) by the market basket percentage increase for the fiscal year.") (emphasis added).

year[s]."  See 42 U.S.C. § 1395ww(b)(2)(D) (emphasis added) (noting "the term 'expected

costs,' with respect to the cost reporting period ending in a fiscal year, means the lesser of the

operating costs of inpatient hospital services or target amount per discharge for the previous cost

reporting period updated by the market basket percentage increase . . . for the fiscal year.").

Congress defined the term "market basket percentage increase" (a term which as mentioned was

incorporated in its definitions of the terms "trended costs" and "expected costs") using a formula

which involved a consideration of the degree to which costs of goods and services in the current

"fiscal year" exceeded the costs of goods and services during the "preceding 12-month cost

reporting period or fiscal year."[10]  Thus, each of the substantive criteria for qualification for a

CIB is constructed around 12 month periods of data.  It thus promotes consistency to interpret the

phrase "full cost reporting period" in the CIB statute as referring to an identical period.

     Congress could have spoken of "36 months" in the CIB provision if this it what it

intended.  The fact that it pointedly specified "three full cost reporting periods" instead must be

presumed to have been a deliberate choice.  See Russello v. U.S., 464 U.S. 16, 23 (1983)

(observing that "[w]here Congress includes particular language in one section of a statute but

omits it in another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion.")  There are sound policy

---

    [10]  See 42 U.S.C. § 1395ww(b)(3)(B)(iii) (providing that the term "'market basket
percentage increase' means, with respect to cost reporting periods and discharges occurring in a
fiscal year, the percentage, estimated by the Secretary before the beginning of the period or fiscal
year, by which the cost of the mix of goods and services . . . including personnel costs but
excluding non-operating costs . . . comprising routine, ancillary, and special care unit inpatient
hospital services, based on an index of appropriately weighted indicators of changes in wages
and prices which are representative of the mix of goods and services included in such inpatient
hospital services, for the period or fiscal year will exceed the cost of such mix of goods and
services for the preceding 12-month cost reporting period or fiscal year") (emphasis added).

reasons why Congress might have decided to require three full 12 month cost reports from providers applying for a CIB.  <u>See</u> Certified Administrative Record for <u>Select Specialty Hosp.-Houston Heights v. Thompson</u>, 1:05CV01791 (RBW) (D.D.C. filed Sept. 9, 2005) at 12 (CMS comments to the Administrator, explaining that "[t]o receive a CIB, a provider's total Medicare inpatient operating costs must be less than the target amount and operating costs from the third full cost reporting period updated," that "[e]ach cost reporting period has its own target amount and update factor," and "[w]e believe Congress specifically required three full cost reporting periods, because the comparison of the current year costs to the prior year's cost and target are not readily determined where the provider has two short periods with different applicable target amounts"); <u>see also</u> Def.'s Opp. at 43-44.

In its briefs, Plaintiff has also failed to respond to the objection that its interpretation of the regulatory and statutory phrase "3 full cost reporting periods" would render the word "full" mere surplusage, an impermissible result.  <u>See</u> Def.'s Opp. at 42.  Plaintiff has also failed to meaningfully respond to the concern that if its interpretation is embraced by the Court it would allow another hospital with 3 cost reporting periods each covering as little as one month to satisfy the "at least 3 full cost reporting periods" requirement, other than with the unhelpful assertion that the Secretary "has miss[ed] Plaintiff's line of reasoning."  <u>See</u> Pl.'s Opp. at 18.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court deny

Plaintiffs' motion for summary judgment and grant the Secretary's motion for summary

judgment.

Respectfully submitted,

_____/ s / _____
JEFFREY A. TAYLOR,
United States Attorney
D.C. Bar No. 498610


_____/ s / _____
MEGAN L. ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7220/FAX: (202) 514-8780

_____/ s / _____
JONATHAN C. BRUMER
D.C. Bar No. 463328
U.S. Department of Health and Human
  Services
Office of the General Counsel
Centers for Medicare and Medicaid Services
  Division
330 Independence Ave., S.W.
Cohen Building, Room 5344
Washington, D.C. 20201
(202) 205-8703/FAX: (202) 401-1405